JOSÉ, mejor conocido por PEPITO TORRES SILVA, ETC., ET AL., demandantes y recurrentes, *v.* EL MUNDO, INC., y UNITED PRESS INTERNATIONAL, INC., demandados y recurridos.

*Número:* R-76-155          *Resuelto:* 18 de octubre de 1977

416

*Otero Suro & Otero Suro, Rodrigo Otero Bigles* y *José R. Otero,* abogados de los recurrentes; *Rivera Cestero & Marchand Quintero,* abogados de El Mundo, Inc.; *Francis, Doval, Colorado & Carlo* y *Arturo Trías,* abogados de United Press International, Inc. y Star Publishing Corporation.

OPINIÓN emitida por el Juez Asociado Señor Torres Rigual(*) a la cual se unen los Jueces Asociados Señores Dávila, Martín y Negrón García.

_____

(*)NOTA DEL COMPILADOR: Esta opinión no fue certificada como opinión del Tribunal Supremo.

Este caso plantea importantes cuestiones relacionadas con la norma de responsabilidad aplicable a un periódico por la publicación de información errónea de carácter difamatorio.

El 26 de agosto de 1974 los periódicos El Mundo y el San Juan Star publicaron la noticia de que Pepito Torres Arroyo, hijo del Director de la Orquesta Siboney, Pepito Torres Silva, fue arrestado y acusado en tres casos de violaciones a la Ley de Sustancias Controladas y de perversión de menores. [1] La información fue suministrada a estos rotativos por la corecurrida United Press International, Inc., en virtud de un contrato de suministro de noticias. Ambos rectificaron prontamente la información haciendo constar que la persona arrestada—José Torres Arroyo—no era hijo del Director de la Orquesta Siboney, Pepito Torres Silva.

Torres Silva es un conocido Director de Orquesta ya retirado. Fundó y dirigió la Orquesta Siboney por más de 20 años, retirándose como su Director en el 1971, aunque ocasionalmente acompaña actividades de esta orquesta cuando las mismas se celebran cerca de su residencia en la Playa de Vega Baja. Grabó discos para varias casas y amenizó por

---

[1] La noticia de El Mundo aparecía con el título de "ACUSAN HIJO DIRECTOR ORQUESTA POR DROGAS" y en lo pertinente el texto leía:

"Pepito Torres Arroyo, hijo del director de la Orquesta Siboney, fue arrestado en Isabela el sábado y acusado de tres casos de violaciones a la Ley de Sustancias Controladas y perversión de menores, según informó la Policía.

"Torres Arroyo, hijo de Pepito Torres Silva, fue arrestado en una redada de un bar de esa población y conducido ante el juez de paz Nelson Rivera Castillo, quien le impuso $20,000 de fianza, siendo ingresado en la granja Penal El Limón al no poder prestarla.

"La Policía informó que agentes de la Unidad de Drogas de la Policía ocupó una cantidad indeterminada de marihuana en la redada.

"Tres mujeres y tres menores también fueron arrestados.

.    .    .    .    .    .    .    ."

La noticia del Star aparecía con el título "SIBONEY BANDLEADER'S SON HELD IN CLUB RAID" y se refería a una información similar a la de El Mundo.

espacio de quince años el "Show Libby's" que se transmitía por radio y televisión; también amenizó bailes y actividades sociales. Torres Silva y su Orquesta Siboney han sido mencionados en periódicos, revistas, programas sociales y de televisión. Fue entrevistado en uno de los programas del "Show de Tommy" por el productor de televisión Tommy Muñiz. Nunca ha ocupado cargos públicos ni ha participado directa o indirectamente en asuntos públicos o de interés general para la comunidad.

El tribunal de instancia dictó sentencia sumaria desestimando la demanda incoada por Torres Silva contra los mencionados rotativos y contra United Press International, Inc., al considerar que de acuerdo con los hechos esbozados no había posibilidad alguna de que el recurrente demostrara la existencia de malicia real. Concluyó el tribunal que Torres Silva se había convertido en figura pública por sus actividades como Director de la Orquesta Siboney y, en consecuencia, le era aplicable la norma de responsabilidad que limita la reclamación de daños a la reputación causados por la publicación de información difamatoria a los casos en que se demuestre que la publicación fue hecha a sabiendas de que la misma era falsa o en grave menosprecio de si era falsa o no. Fundó su fallo en *New York Times* v. *Sullivan,* 376 U.S. 254 (1964); *Curtis Publishing Co.* v. *Butts,* 388 U.S. 130 (1967) y *Chico* v. *Editorial Ponce, Inc.,* 101 D.P.R. 759 (1973).

Torres Silva sostiene en su recurso de revisión que el tribunal de instancia incidió al considerarlo figura pública y, como consecuencia de ello, condicionar su reclamación a la existencia de malicia real.

El estudio que hemos hecho de la cuestión nos convence que, si bien fue errónea la conclusión del tribunal de instancia catalogando al recurrente Torres Silva como figura pública y aplicarle una norma restringida de responsabilidad, debemos, sin embargo, confirmar la sentencia recurrida por los fundamentos que discutiremos más adelante. Procedere-

mos a analizar la doctrina constitucional imperante para luego aplicarla a los hechos específicos de este caso.

## I

### NORMA DE RESPONSABILIDAD APLICABLE

La formulación y aplicación a casos específicos de una norma de responsabilidad que satisfaga el interés social protegido por la libertad de prensa de promover la discusión franca y vigorosa de los asuntos públicos y el interés en la protección del ciudadano contra la publicación de información difamatoria falsa, ha sido fuente de controversia dentro y fuera de la esfera judicial. Véanse al efecto *New York Times* v. *Sullivan,* supra; *Curtis Publishing Co.* v. *Butts,* supra; *Rosenbloom* v. *Metromedia,* 403 U.S. 29 (1970); *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323 (1974); *Time, Inc.* v. *Firestone,* 424 U.S. 448 (1976); Robertson, David W.: *Defamation and the First Amendment,* 54 Texas L. Rev. 199 (1976); Anderson, David A.: *A Response to Professor Robertson: The Issue is Control of Press Power,* 54 Texas L. Rev. 271 (1976); Note: *An Analysis of the Distinction Between Public Figures and Private Defamation Plaintiffs Applied to Relatives of Public Persons,* 49 So. Cal. L. Rev. 1131; Comentario: *Sowing the Seeds of Gertz,* 43 Brooklyn L. Rev. 123 (1976); Eaton, Joel D.: *The American Law of Defamation Through Gertz v. Robert Welch, Inc., and Beyond,* 61 Va. L. Rev. 1349 (1975); Keeton, Robert: *Some Implications of the Constitutional Privilege to Defame,* 25 Vand. L. Rev. 59 (1972); Kalven, Harry: *The New York Times Case: A Note on "The Central Meaning of the First Amendment,"* The Supreme Court Rev. 191 (1964); *The Supreme Court Term,* 88 Harv. L. Rev. 139 (1974–75). Véanse además, *Cortés Portalatín* v. *Hau Colón,* 103 D.P.R. 734 (1975) y *Chico* v. *Editorial Ponce, Inc.,* supra.

█ *New York Times* v. *Sullivan,* supra, marca un nuevo hito en el fortalecimiento de la garantía constitucional de la libertad de prensa al determinar que la publicación de un informe falso o comentarios injustificados relacionados con la conducta oficial de un funcionario público están inmunes de reclamaciones por libelo y gozan de un privilegio restringido, a menos que la información fuera publicada a sabiendas de que era falsa o con grave menosprecio de si era falsa o no. Será necesario de ahí en adelante que el funcionario público demuestre la existencia de malicia real como requisito indispensable. para ser indemnizado por daños a su reputación. *Id.* a las págs. 279–280. La nueva doctrina asegura el espacio vital para el mantenimiento de un clima saludable, de puertas abiertas, en la discusión franca y vigorosa de la conducta y de las ejecutorias de los funcionarios públicos.

█ Se intentó extender esta doctrina a las acciones de libelo ejercitadas por una persona privada por la publicación difamatoria falsa relacionada con su participación en un asunto de interés público o general. *Rosenbloom* v. *Metromedia,* supra. La naturaleza del asunto independientemente de la condición de la persona difamada como determinante para la aplicación de la doctrina vino a constituir un serio obstáculo a las acciones de daños por libelo, en menoscabo del interés individual en la protección de la reputación. Reconociendo esta dificultad y la tensión que inevitablemente produce la afirmación de un interés social sobre otro, en *Gertz* v. *Robert Welch, Inc.,* supra, el Tribunal Supremo de los Estados Unidos elaboró una fórmula de conciliación de ambos intereses, el de la libertad de prensa y el de la reputación de la persona. Se ubica el ámbito de uno y otro interés en la naturaleza del "status" de la persona injuriada. Si la persona injuriada es un funcionario público o una figura pública la norma de responsabilidad aplicable será la restrictiva. de *New York Times* v. *Sullivan,* supra. Pero si la persona in-

juriada no es figura pública, sino privada, las leyes estaduales podrán establecer una norma de responsabilidad menos exigente siempre que no sea la de responsabilidad sin falta, *Gertz* v. *Robert Welch*, supra, a la pág. 347. Tampoco podrá presumirse daños a menos que se pruebe malicia real. *Id.* a la pág. 349.

El fundamento racional de la dicotomía figura pública-privada consiste en que la figura pública, por lo general, goza de un acceso mayor a los medios de comunicación para refutar la publicación difamatoria y contrarrestar su efecto. Además, se asume que la figura pública se ha expuesto voluntariamente al riesgo de un juicio más riguroso por el público. Pero tal asunción no se justifica en el caso de las figuras privadas que no se han lanzado a la palestra pública y cuyo interés en la reputación personal no ha sido menguado por ninguna actuación voluntaria de su parte. La reparación del daño en estos casos es más digna de ser atendida y más justificado el interés del estado en proteger su reputación. *Gertz* v. *Robert Welch,* supra.

■ La jurisprudencia señala los rasgos más peculiares de la figura pública, a saber: 1) especial prominencia en los asuntos de la sociedad, 2) capacidad para ejercer influencia y persuasión en la discusión de asuntos de interés público y 3) participación activa en la discusión de controversias públicas específicas con el propósito de inclinar la balanza en la resolución de las cuestiones envueltas. *Time, Inc.* v. *Firestone,* supra a la pág. 443; *Gertz* v. *Robert Welch, Inc.,* supra a las págs. 342, 345 y 351; *Curtis Publishing Co.* v. *Butts,* supra a las págs. 145–164.

*Gertz* define la figura pública en los siguientes términos:

"En su mayor parte aquellos que alcanzan este status han asumido roles de especial prominencia en los asuntos de la sociedad. Algunos ocupan posiciones de tal poder e influencias que se consideran figura pública para todo propósito. Mas comúnmente, aquellos clasificados como figura pública se han lanzado a la palestra de una controversia pública en particular para influir

en las soluciones de las cuestiones envueltas." *Gertz,* a la pág. 345.

Esta definición se ratificó en *Time, Inc.* v. *Firestone,* a la pág. 453.

■ Hemos visto como progresivamente el régimen de responsabilidad civil establecido en la Ley de Libelo y Calumnia, 32 L.P.R.A. sec. 3141 *et seq.,* ha sido modificado por estas doctrinas constitucionales que proscriben la presunción de malicia, la responsabilidad sin falta y la presunción de daños.

## II

### STATUS DEL RECURRENTE

¿Puede afirmarse que el recurrente Torres Silva es una figura pública conforme los criterios que hemos reseñado? Torres Silva es un Director de Orquesta conocido y, sin duda, respetado y admirado en el mundo de la farándula. Más aún, su nombre puede ser familiar en algunos sectores de la comunidad, pero no tiene, sin embargo, tal notoriedad y prominencia en la vida puertorriqueña, en los asuntos de nuestra sociedad, que lo convierta en una figura pública. Tampoco se ha lanzado a la palestra pública en una controversia sobre el problema de las drogas que es el asunto al que se refiere la información difamatoria que dio motivo a este pleito.

■ La conclusión del tribunal de instancia considerándolo figura pública es, a la luz de lo anterior, equivocada pero ello no es suficiente para la revocación de la sentencia recurrida, a menos que concluyéramos que los recurridos incurrieron en negligencia al publicar la información a que se refiere este caso. Ello es así porque al no proceder la imposición de responsabilidad sin falta, *Gertz* v. *Welch,* supra, ésta sólo puede prosperar sobre la base de negligencia que es la norma formulada por el Código Civil en el Art. 1802, 31 L.P.R.A. sec. 5141, para las acciones de reclamación de daños. La acción de libelo es una acción de resarcimiento de daños dirigida a vindicar el interés social en la reputación de la persona,

razón por la cual encaja perfectamente en la norma de responsabilidad estatuida en el Art. 1802. Antes de la formulación de la nueva doctrina ya habíamos aplicado a una acción de libelo la norma de responsabilidad establecida en el Art. 1802 en otras circunstancias. Véase *Romany* v. *El Mundo, Inc.*, 89 D.P.R. 604 (1963). Su aplicación a todas las acciones de libelo ejercitadas por personas privadas está en armonía con los nuevos desarrollos doctrinales.

Procede ahora que formulemos los criterios que configuran la determinación de negligencia en este caso para resolver si, en efecto, el recurrente adujo prueba para sustanciar su causa de acción.

### III

CRITERIOS PARA LA DETERMINACIÓN DE NEGLIGENCIA

El tribunal de instancia determinó como hechos incontrovertidos que la información sobre el arresto de Pepito Torres Arroyo fue suministrada a los periódicos El Mundo y The San Juan Star por United Press International. El Sr. Eyter Piñón, reportero de United Press en el área de Mayagüez cubrió la información visitando la estación de policías donde fue informado por el Teniente Luis Nieves que la persona arrestada era hijo del conocido Director de Orquesta Pepito Torres. El Teniente Nieves ha sido a través de los años una fuente confiable de noticias para el reportero Piñón. Varios policías corroboraron la información del Teniente Nieves con respecto a los lazos de parentesco existentes entre el arrestado y el recurrente Torres Silva. Piñón envió la noticia por telex a la oficina de United Press International, siendo recibida por la Srta. Sherryll Brownstein, quien le dio curso como parte de su deber de mantener al público informado de noticias de interés general, sin que con ello mediara malicia alguna hacia el recurrente Torres Silva. Piñón no conocía al recurrente ni tenía motivo alguno para dudar de la aseveración del Teniente Nieves y de los otros policías. La Srta.

Brownstein tampoco conocía a Torres Silva y consideraba a Piñón uno de los reporteros más competentes de la empresa.

Surge, además, de la sentencia recurrida, que alrededor de cinco años antes de publicada esta noticia Torres Silva obtuvo información de que una persona de nombre José Torres Arroyo alegaba que era hijo suyo y por tal motivo visitó el periódico El Mundo donde fue entrevistado por la reportera Isabelita Cintrón. Su visita ocasionó que se publicara el 26 de septiembre de 1969 un artículo titulado "Director Orquesta Demandará Músico por Falsa Representación." (²)

■ La formulación de los criterios para la determinación de negligencia en este contexto debe propiciar la armonización de los intereses en conflicto. A esos fines consideramos de utilidad los siguientes factores que deberán ser tomados en consideración:

1) La naturaleza de la información publicada, la importancia del asunto que trata y especialmente si ésta es difamatoria de su propia faz y puede preverse el riesgo de daños.

2) Origen de la información y confiabilidad de su fuente.

3) Razonabilidad del cotejo de la veracidad de la información tomando en consideración el costo en términos de dinero, tiempo, personal, urgencia de la publicación, carácter de la noticia y cualquier otro factor pertinente.

■ La información publicada en este caso quizá pueda ser considerada molestosa y desconcertante para el recurrente Torres Silva pero no es difamatoria de su propia faz. Nótese que la información no le imputaba a Torres Silva la comisión del delito informado en la noticia sino a Torres Arroyo, quien

---

(²) En dicho artículo se dijo, entre otras cosas, que Torres Silva se proponía presentar una demanda por falsa representación contra un joven músico que alegadamente estaba valiéndose de su similitud en los nombres de ambos para hacerse publicidad. Se informó, además, que Torres Arroyo había manifestado que si usaba el nombre "Pepito Torres Junior" era porque en realidad ése era su nombre.

no es parte en el pleito. No puede considerarse difamatoria la información errónea de que éste era hijo de aquél. Uno de los valores más preciados en nuestra sociedad es que a las personas se les juzga por hechos propios y no por asociación de parentesco o de otra índole con otras personas. Pero, aun si el grado de parentesco se considerara difamatorio, el riesgo de daños sería mínimo en este caso porque según las alegaciones de Torres Silva él no tiene hijos varones, lo que es de conocimiento de sus familiares, vecinos, amigos y de las personas cuyo juicio usualmente nos preocupa. Las molestias ocasionadas a Torres Silva ciertamente fueron remediadas por la pronta rectificación del error por los periódicos recurridos.

Es de notar que la información se refiere a un asunto de interés general como es el tráfico de drogas y los esfuerzos de la sociedad en combatirlos y no a un asunto de limitado interés.

La información se recibió de un servicio confiable de suministro de noticias como lo es United Press International. Esta lo obtuvo a su vez de un oficial de la policía que en la experiencia del reportero Piñón era una fuente confiable, siendo, además, corroborada por otros policías. Los recurridos podían razonablemente descansar en la veracidad de la información suministrada por United Press International.

Imponerles a los periódicos en estas circunstancias la verificación de la información recibida constituiría una norma de autocensura en conflicto con la garantía constitucional de la libertad de prensa. *Time, Inc.* v. *Hill*, 385 U.S. 374 (1967). La verificación de noticias es un proceso costoso en dinero, tiempo y personal que sólo debe exigirse cuando de la propia faz de la información surgen dudas de su veracidad o cuando la información pueda ser fácilmente comprobada debido a circunstancias especiales. Robertson, *op. cit.*, a la pág. 261; *Defamation Law After Gertz*, 69 Nw.U.L.Rev.

960 (1975), *cf. Washington Post Co.* v. *Keogh,* 365 F.2d 965 (1966).

Ya vimos que la información publicada en este caso no era difamatoria ni de su propia faz surgen dudas de su veracidad.

El recurrente tampoco ha aducido prueba de que los periódicos recurridos mantengan un archivo clasificado de personas privadas en el cual pudieran fácilmente constatar la veracidad de la información. Es, por demás, muy poco probable que ellos mantengan este tipo de archivo ya que los periódicos no llevan archivo de personas privadas. *Robertson, op. cit.,* 262, nota 387.

■ Las anteriores consideraciones nos convencen que los hechos concluidos por el tribunal de instancia son insuficientes para determinar que los recurridos actuaron negligentemente al publicar la información a que se refiere este pleito.

### IV

■ En resumen, para que prospere una acción de libelo es necesario que la persona difamada alegue y pruebe que: a) la información difamatoria es falsa, b) en el caso de funcionarios o figuras públicas, que se publicó a sabiendas de que era falsa o con grave menosprecio de si era falsa o no, c) en el caso de la persona privada, que la publicación se hizo negligentemente y d) que se causaron daños reales.

Establecemos así un balance razonable entre el interés social encarnado en la libertad de prensa y el interés individual en la reputación protegido por la Ley de Libelo y Calumnia, *supra,* y reconocemos la importancia relativa de cada uno de ellos en nuestro ordenamiento constitucional.

En orden a los anteriores fundamentos *se dictará sentencia confirmando la aquí recurrida.*

El Juez Presidente Señor Trías Monge se inhibió; el Juez Asociado Señor Rigau no intervino; el Juez Asociado Señor

Torres Rigual emitió opinión a la cual se unen los Jueces Asociados Señores Dávila, Martín y Negrón García; el Juez Asociado Señor Díaz Cruz emitió voto concurrente al cual se une el Juez Asociado Señor Irizarry Yunqué.

—O—

Opinión concurrente con la sentencia, del Juez Asociado Señor Díaz Cruz a la que se une el Juez Asociado Señor Irizarry Yunqué.

San Juan, Puerto Rico, a 18 de octubre de 1977

Al igual que la mayoría no considero libelosa la noticia inserta en el periódico El Mundo referente al parentesco del director de orquesta Pepito Torres con un individuo arrestado por infracción de la Ley de Sustancias Controladas.

Mas difiero fundamentalmente de su razón de decidir atada sin necesidad a precedentes foráneos y a doctrinas extrañas a nuestra cultura y contrarias a preceptos terminantes de nuestra Constitución y leyes. [1] Al amparo de ellas

---

[1] Art. II, Sec. 1.—La dignidad del ser humano es inviolable. Constitución.

Art. II, Sec. 8.—Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar. Constitución.

Art. 118, Código Penal (1974)

"Toda persona que maliciosamente a través de cualquier medio, o de cualquier modo, públicamente deshonrare, o desacreditare, o imputare la comisión de hecho constitutivo de delito o impugnare la honradez, integridad, virtud o buena fama de cualquier persona natural o jurídica, o denigrare la memoria de un difunto, será sancionada con pena de reclusión por un término que no excederá de seis meses o multa que no excederá de quinientos dólares, o ambas penas a discreción del Tribunal." 33 L.P.R.A. sec. 4101.

Art. 2, Ley de Libelo y Calumnia de 1902

"Se entiende por libelo la difamación maliciosa que públicamente se hace en contra de una persona, por escrito, impreso, signo, retrato, figura, efigie u otro medio mecánico de publicación, tendente a exponer a dicha persona al odio del pueblo o a su desprecio, o a privarle del beneficio de la confianza pública y trato social, o a perjudicarle en sus negocios; o de

ha disfrutado la prensa del país de inigualable libertad y se ha elaborado una doctrina jurisprudencial fundada en el privilegio restringido y presunción de malicia que ha servido bien al ideal de armónica coexistencia entre la libertad de prensa y la preservación del honor y la reputación personal. Véanse anotaciones bajo 32 L.P.R.A. secs. 3141–3149. De ello dan testimonio las reiteradas declaraciones de la S.I.P. y demás congresos de periodistas que año tras año, invariablemente, destacan a Puerto Rico como uno de los pocos pueblos del mundo en que la libertad de prensa alcanza su plenitud. La opinión sin decirlo intenta desmantelar y arrumbar el valioso acervo de jurisprudencia patria, revocando de paso sus más recientes expresiones que son *Cortés Portalatín* v. *Hau Colón*, 103 D.P.R. 734 (1975), y *Chico* v. *Editorial Ponce, Inc.*, 101 D.P.R. 759 (1973). Constituyen vibrantes voces de nuestra doctrina histórica la declaración del Juez MacLeary: "[E]s la libertad de prensa y no la licencia desenfrenada lo que se intenta proteger por esta disposición de la Constitución." en *Ex Parte Bird*, 5 D.P.R. 247, 252; y el siguiente fundamento de decisión en *In Re Balbás*, 16 D.P.R. 109, 113: ". . . [E]s indiscutible el derecho que tiene el periodista para censurar los actos públicos y oficiales de toda autoridad o funcionario, así como el de criticar y discutir razonadamente todas las resoluciones de cualquier tribunal de justicia por alto que éste sea después de terminado el juicio o procedimiento, pero sin infringir con las palabras y

otro modo desacreditarle, menospreciarle, o deshonrarle, o cualquiera difamación maliciosa publicada, como antes se ha dicho, con la intención de denigrar o deprimir la memoria de un muerto y desacreditar o provocar los parientes y amigos sobrevivientes." 32 L.P.R.A. sec. 3142.

Art. 5, Ley de Libelo y Calumnia de 1902

"Se presumirá que existe malicia en cualquier comunicación o escrito infamatorio o calumnioso que se dirija a otra persona que no sea un pariente dentro del tercer grado, o a una persona a quien el autor tenga bajo su tutela, o cuando dicha comunicación se cruce entre personas que tengan negocios en sociedad, u otra asociación semejante." 32 L.P.R.A. sec. 3145.

conceptos estampados en el periódico las leyes penales a las que está sometido como otro ciudadano cualquiera que tenga libres y sanas sus facultades mentales."

No se justifica descartar el Derecho patrio en pro de decisiones pragmáticas de tribunales norteamericanos en un campo que se halla en estado fluido, con vaivenes mercuriales. El propio Tribunal Supremo de los Estados Unidos, reconociendo la variedad de conceptos morales aún dentro de los estados federados, ha dejado en manos de la Asamblea Legislativa estatal la formulación de política respecto a las distintas expresiones pornográficas. *Miller* v. *California*, 413 U.S. 15 (1973); *Hamling* v. *United States*, 418 U.S. 87 (1974). No veo razón para que Puerto Rico no tenga la misma autonomía para trazar su propia línea entre periodismo y difamación. La diversidad de estados y comunidades es una de las fuentes de creatividad en el derecho constitucional americano de nuestros días. Desoyendo la apertura del Tribunal Supremo nacional que alienta la expresión nativa en materia de ética, tradición y moral públicas, no hemos podido superar la rutina de adhesión.

La eliminación de la presunción de malicia en el líbelo per se (Art. 5 de la Ley) tiene proporciones de desastre en términos de civilización. Bajo la doctrina que acoge la otra expresión concurrente precariamente sostenida en *Gertz* v. *Welch*,[2] 418 U.S. 323 (1974); 41 L.Ed. 2d 789, un hombre honrado calificado de ladrón por un periódico vendría obligado a probar su honradez, entre otras cosas, e igual cuesta procesal tendría que repechar una mujer honesta que ve su honor enredado en titulares.

Este Tribunal responde esencialmente a los valores pre-

---

[2] *Gertz* es una decisión por mayoría de 5 a 4 con el Juez Blackmun uniéndose a la mayoría "because his vote was needed to create a majority."

El Juez Presidente, uno de 4 disidentes, dijo, "that he would prefer the area of the defamation law with respect to private citizens to evolve as it has up to now, rather than embark on a new doctrine without jurisprudential ancestry."

servados y enaltecidos en nuestra propia legislación. A las fuentes extrañas se acude para tomar de ellas lo bueno que pueda integrarse a nuestro Derecho sin el trauma de un trasplante que el organismo rechaza. ¿O es que regresamos a la euforia innovadora a ultranza, descartando la tradición jurídica por el último eco de Idaho, Utah o California?

Los hechos de este caso son de solución simple. La demanda no pasa la prueba de suficiencia y el auto fue indebidamente expedido. Ha sido innecesaria esta incursión en los difusos predios del Norte al punto de inyectar "el costo en términos de dinero" (pág. 425, ponencia) como uno de los factores atenuantes de responsabilidad en libelo. La prensa que honra sus credenciales constitucionales respetando derechos humanos de igual jerarquía, se ha sentido libre y en salud hasta ahora en nuestro país, sin la ortopedia de *Gertz* y sus antepasados inmediatos que en gesto oficioso le ofrece ahora el inocuo voto mayoritario, y que en resultado final abriría puertas al abuso del derecho en la desigual confrontación entre el periódico y la persona que difiere de sus puntos de vista, o que es tema de sus columnas.

Creo que este Tribunal ha debido formular, y en gran medida ratificar, su doctrina autóctona en torno a los fundamentales derechos de libertad de expresión y protección del honor y la vida íntima, de la que dolorosamente se aparta el voto concurrente del Juez Torres Rigual. La desviación ni siquiera se justifica ante los ojos de aquellos que anteponen la libertad de palabra al derecho de privacidad y esencial dignidad humana, toda vez que con los hechos que este caso presenta, no había necesidad de renegar de nuestra doctrina para absolver al periódico. Al tomar este curso la mayoría, aun cuando académica, transgrede su propia norma en cuanto a que los tribunales deben evitar cuestiones constitucionales si el caso puede ser resuelto por otros motivos. *Pueblo ex rel. M.G.G.*, 99 D.P.R. 925, 927 (1971), principio que adoptamos persuadidos por la juridicidad de *Ashwander* v. *Tenn. Valley*

*Authority*, 297 U.S. 288, 346–347 (1936), en *E.L.A.* v. *Aguayo*, 80 D.P.R. 552, 595–596 (1958), seguido por *Suárez Sánchez* v. *Tribunal Superior*, 92 D.P.R. 507 (1965). *Mari Bras* v. *Alcaide*, 100 D.P.R. 506, 513 (1972); *Martínez Rodríguez* v. *Jefe Penitenciaría*, 92 D.P.R. 629, 642 (1965).

Hubiese confirmado la sentencia del Tribunal Superior desestimando el recurso indebidamente expedido, sin mayor expresión.