ÁNGEL OLIVERAS, demandante y recurrido, *v.* REINALDO PANIAGUA DIEZ, demandado y peticionario.

*Número:* O-84-46    *Resuelto:* 9 de abril de 1984

*Elisabet Rodríguez Pérez,* abogada del peticionario; *Héctor Lugo Bougal,* abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Este recurso plantea como interrogante si la doctrina de "malicia real" expuesta en *Torres Silva* v. *El Mundo,* 106 D.P.R. 415 (1977), aplica a acciones por alegada difamación cuando el que la origina es persona ajena a la prensa.

I

El peticionario Ángel Oliveras, Redactor Jefe de Deportes del periódico El Nuevo Día, escribió y publicó bajo la sección([1]) de deportes en la edición del 14 de enero de 1981 un artículo titulado([2]) *Réquiem para los que no fueron Super*

---

([1]) "Columna: Llamadas también 'secciones', son espacios ágiles de un periódico, ya sea de comentarios o noticias." R. Guarderas, *Periodismo,* Méjico, Ed. Diana, 1971, pág. 38.

([2]) "'El título presenta a la noticia'. Por ello, es sumamente importante que el título sea concebido y escrito con ponderación, reflexión e inteligencia. El título es el primer polarizador de la atención del lector." D. De Gregorio, *Metodología del Periodismo,* Madrid, Ed. Rialp, 1966, pág. 81.

*Cangrejeros.* En el mismo, a modo de comentarios, (3) expuso los errores que a su juicio contribuyeron a la derrota en la temporada de ese año del equipo de béisbol Cangrejeros del Santurce frente a los Criollos del Caguas y criticó a su presidente, Lcdo. Reinaldo Paniagua Diez. Destacamos los siguientes asertos:

> Lo de Super siempre fue antipático . . . desde que lo lanzaron al mercado en la temporada 79-80. Se lo apunté al propietario de los Cangrejeros, Reinaldo Paniagua.
>
> Super viene del latín "super". Significa sobre y en las voces de nuestra lengua a que se halla unida, denota preeminencia como en superintendente; grado sumo, como en superfino; exceso o demasía como en superabundancia, supernumerario.
>
> .　　.　　.　　.　　.　　.　　.　　.
>
> Si se anuncia que se trae un superequipo hay que demostrarlo sobre el terreno de juego. En el 79-80 no fueron tan super y en el 80-81 mucho menos. Fueron superinfelices. Así que lo más conveniente para la gerencia de los Cangrejeros, si es que quieren atraer nuevamente al fanático, es que se dedique a contratar peloteros y busque otro "gimmick". Descanse en paz lo de Super.
>
> Pero vamos a lo más importante . . . al conjunto.
>
> En este país no se puede ser muy franco porque luego se inicia una serie de presiones que para qué les cuento. Pero estoy seguro que Paniagua prefiere, aunque le duela, reconocer los errores cometidos, que aquellos que se le acercan y no pueden decirle las verdades.
>
> Sin miedo.
>
> .　　.　　.　　.　　.　　.　　.　　.

---

(3) Cardó afirma: "Son espacios dedicados a la crítica o simple exposición de criterios de los redactores, que generalmente son especializados, como por ejemplo el de política, deportes, espectáculos, etcétera, en los cuales la opinión muy subjetiva del escritor resulta una orientación para ciertos hechos que han sucedido o van a suceder; en ellos el lector encuentra muchas veces un consejo determinado para tal o cual asunto que piensa realizar o investigar, pero que realmente no encuentra a su alrededor personas que conozcan el asunto. Los comentarios de deportes —por ejemplo— dan a los lectores una idea de la situación real a la fecha de las competencias, líderes y coleros, dudas acerca de tal o cual contrincante, aspiraciones mismas, que son también del pueblo, etcétera." J. Cardó Guarderas, *Periodismo*, Méjico, Ed. Diana, 1974, pág. 96.

Aquí falló Paniagua cuando no supo aprender de Cuevas, quien nació hace muchos años y ama, a su manera, el béisbol.

Lamentablemente ése no es el caso de Paniagua, quien tuvo que unirse a las huestes políticas de su partido. Esto último contribuyó en parte a que se alejara el fanático.

. . . . . . . . .

Cuando no se puede salir del pelotero, hay que salir del dirigente. Pero la gerencia santurcina hizo caso omiso de la petición del fanático. Tanto Rojas como Paniagua lo sabían. Pero no escucharon el pedido del fanático, que es el que paga y es al que hay que tener contento todo el tiempo.

. . . . . . . . .

Algunos que están dentro y fuera del terreno, creen que lo saben todo.

. . . . . . . . .

Así que a Paniagua le corresponde hacer un profundo examen de conciencia y darse a la tarea de comenzar en cero, porque el fanático cangrejero es de los buenos y no se anda con eso de que estábamos en año de elecciones.

El 20 de enero dicho rotativo imprimió en la misma sección un artículo suscrito por Paniagua Diez denominado *Responde el dueño del Santurce*. Caracterizó la previa publicación como "un artículo convertido en casi 'editorial deportivo'", cuestionó los móviles de Oliveras y entre otras aseveraciones consignó:

Normalmente a un artículo como el escrito por Ángel Oliveras no le hago caso, pero el mismo se publica en un momento de natural desasosiego para nuestra fanaticada, y me siento en la obligación moral de hacer unas expresiones para que la gran legión de seguidores Cangrejeros, no vayan a dar crédito a todo lo que este señor publica y que también conozcan sus motivaciones.

Comencemos por establecer que Ángel Oliveras trabajó con el equipo Santurce hace varios años, cuando todavía yo no había intervenido con el mismo. Luego, el año pasado, insinuó a través de un empleado mío y posteriormente a mí, que deseaba trabajar con el Santurce nuevamente. No me atreví colocarle en un trabajo temporero, durante la temporada 1979–

80, ya que siendo este señor editor deportivo del periódico El Nuevo Día, podía interpretarse que comprábamos así su conciencia.

Estoy consciente de que eso no le gustó, pero no podíamos complacerle en algo que considerábamos moralmente incorrecto. Posteriormente, durante la temporada 1980-81 que acaba de concluir, se hizo cargo Ángel Oliveras, mientras actuaba como editor deportivo de El Nuevo Día, de ciertas transmisiones de radio con el equipo de Caguas, que lo contrató. Tengo entendido que luego fue orientado por sus superiores a que descontinuara esa práctica.

Mi pregunta, antes de exponer la posición del Santurce en cuanto al artículo, ¿tiene el autor de esa pieza negativa el "standing moral" para actuar como crítico del equipo Santurce? ¿Lo está haciendo con limpieza y honestidad periodística, o lo hace sangrando por la herida? ¿No es "payola" el término que utilizan los propios periodistas cuando una parte interesada contrata a uno de estos para que lo favorezca ante la opinión pública?

A los pocos días de esta publicación Oliveras fue relevado de sus funciones como Redactor Jefe de Deportes por el periódico.

El 11 de febrero, Oliveras en unión de su esposa, Edwina Sánchez, por sí y en representación de la Sociedad de Gananciales, demandó a Paniagua Diez por libelo, reclamando daños en exceso de $400,000. Así las cosas, éste solicitó sentencia a su favor basada en una declaración jurada, un requerimiento de admisiones en interrogatorios.[4] Oliveras se opuso limitándose a suscribir bajo juramento haber leído las réplicas formuladas por sus abogados las cuales "recogen y reflejan la verdad, y nada más que la verdad". El tribunal de instancia negó la sentencia sumaria. A solicitud de Paniagua Diez revisamos.

---

[4] Oliveras admitió bajo juramento que siendo editor deportivo del periódico El Nuevo Día, durante la temporada de béisbol de 1981, a razón de $35 por presentación, trabajaba para el equipo de los Criollos de Caguas en la antesala de ciertas transmisiones radiales entrevistando a los jugadores y dirigentes.

## II

Debemos determinar si el escrito de Paniagua Diez es uno de carácter libeloso, que conlleva la concesión de un remedio de indemnización por daños a la luz del *status* de los protagonistas y el mecanismo de sentencia sumaria. [5]

█ No se cuestiona que en acciones basadas en libelo —aparte de probar que la información difamatoria sea falsa y que se causen daños reales— existen dos posibilidades respecto a la clasificación de la persona afectada: que sea una figura privada o una pública. En síntesis, bajo la primera, para que prospere la acción basta que el actor establezca la negligencia del autor del escrito. En tal instancia, el concepto de negligencia responde básicamente a aquel elaborado en el campo del derecho de daños y perjuicios. Sin embargo, respecto a la segunda es menester demostrar malicia real. Entonces nos apartamos del tratamiento ordinario para entrar en consideraciones exclusivas de una acción por difamación, en este caso libelo, contra figuras públicas.

En *Torres Silva* v. *El Mundo*, supra, expresamos:

*New York Times* v. *Sullivan* [376 U.S. 254 (1964)] marca un nuevo hito en el fortalecimiento de la garantía constitucional de la libertad de prensa al determinar que la publicación de un informe falso o comentarios injustificados relacionados con la conducta oficial de un funcionario público están inmunes de reclamaciones por libelo y gozan de un privilegio restringido, a menos que la información fuera publicada a sabiendas de que era falsa o con grave menosprecio de si era falsa o no. Será necesario de ahí en adelante que el funcionario público demuestre la existencia de malicia real como requisito indispensable para ser indemnizado por daños a su reputación. [Cita.] La nueva doctrina asegura el espacio vital

_____

[5] Tanto en el foro de instancia como ante nos, Oliveras enfatiza y dirige parte de sus señalamientos contra El Nuevo Día aduciendo que la publicación del artículo por Paniagua provocó su cesantía. Bajo esta proposición, inmerso en su argumento, está la premisa de que el despido fue injustificado. Sin resolverlo, de ser así, la acción sería contra dicho rotativo.

para el mantenimiento de un clima saludable, de puertas abiertas, en la discusión franca y vigorosa de la conducta y de las ejecutorias de los funcionarios públicos. Pág. 421.

Este requisito de malicia real fue ampliado para incluir figuras públicas. *García Cruz* v. *El Mundo*, 108 D.P.R. 174 (1978). [6]

■ En este contexto resulta de importancia la clasificación del periodista Ángel Oliveras como figura "privada" o "pública". Ello a su vez afectará su causa de acción. En *Pueblo* v. *Olivero Rodríguez*, 112 D.P.R. 369, 374-375 (1982) expusimos:

El concepto "figura pública" ha sido examinado por este Tribunal en *García Cruz* v. *El Mundo, Inc.*, 108 D.P.R. 174 (1978), y *Torres Silva* v. *El Mundo, Inc.*, 106 D.P.R. 415 (1977). En ambos reconocimos su evolución doctrinaria, dinámica y los elementos integrantes peculiares que deben concurrir para rubricar tal condición, a saber:

. . . 1) especial prominencia en los asuntos de la sociedad, 2) capacidad para ejercer influencia y persuasión en la discusión de asuntos de interés público y 3) participación activa en la discusión de controversias públicas específicas con el propósito de inclinar la balanza en la resolución de las cuestiones envueltas. *Time, Inc.* v. *Firestone*, supra a la pág. 443; *Gertz* v. *Robert Welch, Inc.*, supra a las págs. 342, 345 y 351; *Curtis Publishing Co.* v. *Butts*, supra a las págs. 145-164.

*Gertz* define la figura pública en los siguientes téminos:

"En su mayor parte aquellos que alcanzan este status han asumido roles de especial prominencia en los asuntos de la sociedad. Algunos ocupan posiciones de tal poder e influencias que se consideran figura pública para todo propósito. Mas comúnmente, aquellos clasificados como figura pública se han lanzado a la palestra de una controversia pública en particular para influir en las soluciones de las cuestiones envueltas." *Gertz*, a la pág. 345. *Torres Silva*, supra, pág. 422.

Y ampliando esta definición señalamos:

Vemos, pues, que la noción de figura pública está estrechamente vinculada —por razón de la posición oficial, poder o

---

[6] Véanse: *Chico* v. *Editorial Ponce, Inc.*, 101 D.P.R. 759 (1973); *Aponte Martínez* v. *Lugo*, 100 D.P.R. 282 (1971).

envolvimiento en los asuntos públicos— a la adquisición de relieve, prominencia, fama o notoriedad especial o general en la comunidad que, como corolario, de modo significativo le permite de ordinario a una persona cierto acceso a los medios efectivos de comunicación para exponer, adelantar y debatir sus puntos de vista ante la opinión pública, y como resultado corre el riesgo de estar más expuesta al escrutinio, atención e interés público . . . . Pág. 375.

■ Al confrontar la figura de Oliveras en su función de periodista, en particular redactor jefe de deportes —activamente envuelto en el mundo del deporte como espectador, entrevistador, analista y comentarista— observamos que se ajusta a la descripción básica de figura pública. En su persona concurren todas las características esenciales que diferencian a una persona pública de una privada. "En la esfera política, los medios informativos han sido llamados con propiedad 'la cuarta rama del gobierno', nombre que describe la función del periodismo como guardián fiel y motivador de las otras tres ramas. El medio tiene poder e influencia en las esferas sociales, políticas y económicas de la sociedad. Debido a que nos proporciona tanta información crucial es en gran parte responsable por la realidad percibida por cada persona y su información." L. Brown, *Responsabilidad Social de la Prensa*, México, Eds. Asociados, 1977, pág. 9. Véase, además, T. E. Berry, *Journalism in America*, New York, Hasting House Pubs., 1976, pág. 2.[7] "El 'concepto unificador' comprensivo de la totalidad de campos que investigan las Ciencias de la Información, puede

---

[7] Aun sus críticos reconocen el poder e influencia de la prensa escrita: "Spengler, cuando argumenta que el medio prensa es la causa de una deterioración de la cultura: 'La democracia *ha sustituido* totalmente, en la vida espiritual de las masas populares, el libro por el periódico. El mundo de los libros, con su riqueza de puntos de vista —riqueza que obligaba al pensamiento a elegir y a criticar—, no es *ya* propiedad real más que de reducidos círculos. El pueblo lee un periódico, su periódico, que penetra diariamente en millones de ejemplares en todas las casas, ata de buena mañana todos los espíritus a su poder, hace *olvidar* los libros que aún aparecen en el horizonte del individuo'." L. Núñez Ladevéze, *El Lenguaje de los Media*, Madrid, Eds. Pirámide, 1979, pág. 95.

describirse así, según A. Benito: 'Quien dice *qué* a *quién*, *cómo* y por qué *medios* y con qué *consecuencias'*." J. L. Martínez Albertos, *El Mensaje Informativo*, España, Ed. A.E.T., 1977, pág. 106.

Como periodista profesional Oliveras tiene particular acceso a los medios informativos. "Los periodistas constituyen un grupo importante en nuestra sociedad, pues recae mayormente en ellos la responsabilidad de averiguar, informar y orientar al público en general sobre los acontecimientos y tendencias en el ambiente nacional e internacional. *Se han tornado en los principales medios a través de los cuales la gente se entera —en adición a sus experiencias inmediatas— de lo que ocurre en el mundo circundante.*" (Énfasis suplido.) R. Anderson, *La Prensa en Puerto Rico*, Comisión de Derechos Civiles, 1977, pág. 44.

Su condición de jefe de redacción —como el título sugiere— no limitaba su función a simplemente informar eventos noticiosos. Bajo el prisma del deporte, tenía amplia libertad para expresar, comentar y juzgar. "Ciertamente el escritor de deportes tiene una oportunidad única de desarrollar un estilo único. . . . Puede decirse que los choques deportivos están hechos a la medida para producir un estilo vigoroso. Pero si esto fuera poco, el escritor de deportes disfruta de una libertad especial." W. L. Rivers, *Periodismo, Prensa, Radio y TV*, Méjico, Ed. PAX, 1969, pág. 219.

El periodismo dinámico y activo del presente no sólo informa la noticia, critica y denuncia, sino que la investiga, participa y la hace. "Muchas secciones de deportes, especialmente en grandes periódicos en años recientes han aumentado el énfasis en el reportaje interpretativo. Ello se debe en parte a un incremento en las transmisiones, especialmente la televisión, que al presente suministra las puntuaciones y jugadas diarias de eventos deportivos específicos mucho antes de que puedan ser cubiertos por los periódicos. Los periódicos ahora miran más hacia el *cómo y por qué* de los sucesos cubiertos por la prensa hablada y a la interpre-

tación de historias sobre las tendencias envueltas en los equipos o el deporte. . . . Muchas veces el comentario crítico es limitado debido a que el periodista está muy cerca de aquellos de quienes escribe. Es muy difícil socializar repetidamente con un equipo y después informar objetivamente sus fallas y logros. . . . Debe mejorarse la información y análisis del periodismo deportivo pues las secciones del deporte tienen una influencia considerable sobre los deportes y los millones de personas interesadas." (Traducción nuestra.) E. C. Hynds, *American Newspaper in the 1970's*, New York, Hasting House Pubs., 1975, pág. 172; C. Warren, *Modern News Reporting*, 3ra ed., New York, Harper & Row Pubs., 1959, págs. 328-346.

Es innegable que el papel que desempeñaba Oliveras dentro del campo deportivo es uno de verdadera influencia, llegando a un gran sector de la población con sus opiniones y críticas. Que un periodista tenga acceso a un público ávido de noticias en forma de comentarios, resulta incompatible con la reclamación del *status* de figura privada. "Parece estar fuera de duda que el sujeto activo de aquella particular forma de comunicación masiva, que es la noticia periodística, es el periodista . . . en la base de todo ello está siempre el individuo, el escritor, el periodista." D. De Gregorio, *Metodología del Periodismo*, Madrid, Ed. Rialp, 1966, pág. 16. Anderson, en su estudio plantea la posibilidad de que secciones especiales de los periódicos tales como la del deporte, "contribuyan a formar valores y actitudes políticas o culturales, no sean las columnas de información noticiosa . . .". Pág. 65. Con referencia a los medios de información, se ha dicho:

Su influencia y su responsabilidad son enormes, porque el impacto que produce en la opinión pública es una de las fuerzas motivadora[s] más rigurosas de nuestra sociedad. J. Hohenberg, *El Periodista Profesional*, Méjico, Ed. Letras, 1964, pág. 24.

El periodismo es "un instrumento, un poder, una profesión, un género literario, una fuerza social y un derecho

público". J. Cardó Guarderas, *Periodismo*, México, Ed. Diana, 1974, pág. 23; Johnstone, Seawski & Bowman, *The News People*, Illinois, U. Ill. Press, 1976, págs. 181–188.

### III

Aclarado este extremo, notamos que nuestra casuística expositiva del requisito de "malicia real" ha sido articulada en situaciones que envuelven la publicación de un escrito por la prensa. Como consecuencia, el análisis recaía constitucionalmente sobre la libertad de prensa. En el caso de autos ello no está en juego. El autor del escrito en controversia es una persona, que aunque de relieve público, a los fines adjudicativos, es ajena al medio noticioso. En lugar de caer bajo el resguardo de la "libertad de prensa", lo está bajo la "libertad de expresión".

Ante esta perspectiva, ¿cuál es el criterio a utilizarse —negligencia o malicia real— cuando está envuelta la libertad de expresión y no la de prensa? La cuestión, aunque nueva en esta jurisdicción, ha sido objeto de estudios y comentarios en otras latitudes. A tal efecto, R. Sack nos dice:

> Inexplicablemente la Corte Suprema se ha negado a confirmar que la doctrina de "malicia real" del *New York Times* aplica en pleitos de funcionarios públicos y figuras públicas contra demandados que no pertenecen a los medios noticiosos. Pero en *Rosenblatt* v. *Baer*, la doctrina del *New York Times* fue aplicada al demandado que sólo de manera marginal era del medio noticioso: un contribuyente regular, pero no un empleado del periódico. Y en *St. Amant* v. *Thompson*, la doctrina se aplicó a un pleito contra un candidato a un puesto público no vinculado a la prensa; sus manifestaciones, objeto del pleito, habían sido televisadas. Otras cortes han sostenido o simplemente asumido que *New York Times* aplica a demandados que no pertenecen a la prensa. Ninguna corte ha resuelto en contrario.
>
> Sería ilógico proteger especialmente a los medios noticiosos en la discusión pública y crítica del gobierno o personas envueltas en asuntos públicos y remover esa protección de los ciudadanos individuales. La difamación por la prensa del

gobierno y sus agentes, o de figuras públicas, posiblemente atraerá más pleitos que aseveraciones privadas. Ello no es razón suficiente para no conceder esa protección al ciudadano particular por lo que él, como participante de la democracia, dice sobre su gobierno o sobre aquellas personas que han asumido una prominencia especial en la sociedad. (Traducción nuestra.) R. Sack, *Libel, Slander and Related Problems*, New York, Practicing L. Inst., 1980, págs. 227-228.

La cita transcrita refleja el pensamiento mayoritario, aunque no unánime. J. Christie, *The Public Figure Plaintiff v. The Nonmedia Defendant in Defamation Law: Balancing the Perspective Interests*, 68 Iowa L. Rev. 517 (1983); J. D. Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primes*, 61 Va. L. Rev. 1349, 1416-1417 (1975). J. P. Brody, *Defamation Law of Wisconsin*, 65 Marq. L. Rev. 505, 540 (1982).

El reconocimiento de unos derechos a la prensa inexorablemente conlleva extender iguales derechos y privilegios a la ciudadanía en particular vía la cláusula sobre libertad de expresión. En el desarrollo de una sociedad democrática ambas caminan juntas de la mano. En última instancia el valor que late en el fondo de la cuestión es de singular jerarquía. "Lo que se debe proteger no es la *institución* en sí, sino la *labor* de la prensa: viabilizar un vehículo de información y opinión, informar y educar al público, ofrecer críticas, proveer un foro para la discusión y el debate, y actuar como un sustituto para obtener noticias e información para sus lectores, que por sí y como individuos no pueden o desean compilarla. Una garantía especial de la libertad de prensa deberá aplicar no solamente a aquellos que la corte podía clasificar como 'prensa' sino a quienquiera, de cualquier tamaño, y cualquier medio, que regularmente asuma la misión de la prensa." (Traducción nuestra.) B. J. Chamberlain, C. J. Brown, *The First Amendment Reconsidered*, New York, Longman, 1982, pág. 110.

El escrito y expresiones de Paniagua Diez[8] hacia Oliveras, figura pública para fines decisorios, caen bajo el privilegio restringido reconocídole al autor. Por ende, Oliveras viene obligado a probar que existió malicia o grave menosprecio de la verdad para que prospere su acción en daños y perjuicios por libelo.

## IV

La procedencia de una sentencia sumaria en una situación fáctica y jurídica como la de autos es un remedio procesal apropiado. En *García Cruz* v. *El Mundo*, supra, dijimos:

> Tanto *Torres Silva* como *Zequeira Blanco* sostienen la procedencia de una sentencia sumaria cuando el demandante no demuestra la existencia de malicia real. Se ha expresado que "aunque los tribunales vacilan en dictar sentencias sumarias . . . aun así han exigido a menudo una observancia más estricta de las disposiciones de la Regla 56(e) de las Reglas Federales de Procedimiento Civil [36.5 nuestra], cuando la acción envuelve los derechos de expresión de un demandado, ya que la prolongación de estos pleitos tiene un impacto disuasivo sobre el ejercicio de tales derechos". Ha llegado a resolverse que el procedimiento de sentencia sumaria es "una parte integral de la protección constitucional disponible a los demandados" en esta índole de litigio.

> En *Carson* v. *Allied News Co.*, 529 F.2d 206, 210 (7th Cir. 1976), se expresó que a menos que el tribunal determine, a base de declaraciones juradas, deposiciones u otra prueba documental, que la parte demandante puede probar la existencia de malicia real, en el sentido que se emplea el término en *New York Times*, debe dictarse sentencia a favor de la parte demandada.

> Son en extremo numerosos los casos en que se ha concedido,

---

(8) Sobre el derecho a replicar, véanse: S. Trippi, *Defamation of a Public Personal: The Need to Provide A Forum For Reply*, 26 Loy. L. Rev. 114, 121–133 (1980); T. Barton Carter, *Right of Reply Versus the Sullivan Rule: Time for a Second Look*, 27 Loy. L. Rev. 41 (1981); T. H. Suddatch, Jr., *Waldbaum v. Fairchild Publicational, Inc.: Giving Objectivity to the Definition of Public Figures*, 30 Cath. U.L. Rev. 307 (1980).

como en esta jurisdicción, el remedio de la sentencia sumaria en casos de libelo.

*New York Times Co.* v. *Sullivan,* supra, 283-92, estableció que el asunto de la suficiencia de la prueba para establecer la existencia de malicia real plantea estrictamente una cuestión de derecho. *Rosenblatt* v. *Baer* [383 U.S. 73 (1966)], sentó el mismo principio en lo que respecta a la determinación de lo que constituye una figura pública. La controversia trabada en el caso presente es por tanto de naturaleza puramente jurídica. (Citas omitidas.) Págs. 182-183.

Los planteamientos levantados por el demandante Oliveras en oposición a que se dicte sentencia sumaria nos convencen que no aportó nada, para ni siquiera implicar, que Paniagua Diez actuara con malicia o con grave menosprecio de la verdad al contestarle sus observaciones y críticas originales.[9] Se ha dicho que "la materia prima del periódico son las noticias y las ideas que en ella se contraen; dicho con otras palabras, su contenido". De Gregorio, *op. cit.,* pág. 58. Más adelante, este mismo autor informa: "Lo más elemental es el *comentario,* que constituye el juicio del periódico o del periodista, en forma declaradamente personal o subjetiva, acerca de un hecho o de un acontecimiento." Íd., pág. 63.

Tampoco nos persuade del contenido difamatorio del escrito o que trascienda los límites jurídicamente permisibles de la función informativa, crítica y del libre intercambio de ideas. "La crítica confirma la estatura e importancia de su tema. Como la imitación, es una forma sincera de adulación. . . . La crítica a menudo es mal usada. Pero cuando está bien informada, y es honesta puede ser una poderosa fuerza social." Brown, *op. cit.,* pág. 86. Y en la misma sintonía conceptual: "El elogio y la crítica han de tener también

---

[9] "Un editorial, un artículo de fondo, un comentario crítico son, habitualmente, el desarrollo argumentado de una tesis previa y, además, un desarrollo discursivo, en el que la escritura se comba para potenciar sus recursos persuasivos, desde el estilo a la ironía, desde la selección del dato a la consistencia cuasilógica de la argumentación." Núñez Ladevéze, *op. cit.,* pág. 295.

como presupuesto, la libertad." El elogio sin libertad, como recuerda diariamente el periódico francés *Le Fígaro*, es adulación. [10]

Aplicable al caso de autos resulta lo resuelto en *García Cruz* v. *El Mundo*, supra: "Considerados los principios expuestos, resolvemos que el demandante no podía derrotar la moción de sentencia sumaria en las particulares circunstancias de este caso con la afirmación escueta de que no era una figura pública y su aserto general de que la noticia se publicó maliciosamente." Pág. 183.

*Se dictará sentencia y revocará la resolución del tribunal de instancia fechada el 13 de diciembre de 1983. Se desestimará sumariamente la demanda.*

El Juez Presidente Señor Trías Monge concurre en el resultado sin opinión. El Juez Asociado Señor Rebollo López emitió voto concurrente y los Jueces Asociados Señores Díaz Cruz e Irizarry Yunqué no intervinieron.

—O—

Voto concurrente emitido por el Juez Asociado Señor Rebollo López.

Somos del criterio que dados los hechos específicos del presente caso, es completa y totalmente innecesario el entrar en la consideración de si el editor deportivo de un periódico es o no —a los fines de una demanda por libelo— una "figura pública" y si la doctrina de "malicia real" aplica o no en acciones por alegada difamación cuando el que "la origina" es persona ajena a la prensa.

Ello es así por cuanto los hechos a que se hace referencia en el artículo publicado bajo la firma del demandado Pania-

---

[10] E. Ruiz Vadillo, *Algunas anotaciones sobre la información periodística en los derechos penal y civil de España y sus límites*, 33 Rev. Gen. Derecho 1.187 (1976).

gua son ciertos, (¹) *situación aceptada por el demandante Oliveras en la etapa de descubrimiento de prueba.*

Esos hechos aceptados como ciertos por el referido demandante son los que *sirven de base* a la manifestación que, en forma de pregunta, hace el demandado Paniagua y que es señalada por el demandante como difamatoria. (²)

Manifestaciones, comentarios o críticas, como las aquí objetadas, *no* son libelosas bajo la doctrina del "comentario justo" *(fair comment)* o de la inferencia lógica y razonable que de un hecho cierto puede hacer una persona, los cuales están protegidos por el derecho de libertad de expresión que le garantiza a toda persona la Constitución del Estado Libre Asociado de Puerto Rico y la Constitución de los Estados Unidos de América.

A estos efectos encontramos expresiones tales como las expuestas en *Gertz* v. *Welch,* 418 U.S. 323, 339–340 (1974), en el sentido de que: "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas"; en *Bailey* v. *Charleston Mail Association,* 27 S.E.2d 837, 842 (1943), en donde se expresó: "Treating the matters alleged in the plea to be true, the comments appearing in the editorials are not so violently or intemperately expressed as to trascend *the right of fair comment made on the basis of truth.* . . . If the facts expressed in a writing *form a sufficient, reasonable and logical basis for the inferences, comments, criticisms and opinions expressed,* no liability for such comment is imposed on the defendants, even if the comment is uncharitable" (énfasis suplido); y en *Wehringer* v. *Newman,* 400

---

(¹) A los efectos de que mientras el demandante Oliveras trabajaba como editor deportivo del rotativo en controversia realizó trabajos, mediante paga, para un equipo profesional de pelota.

(²) "¿No es 'payola' el término que utilizan los propios periodistas cuando una parte interesada contrata a uno de éstos para que lo favorezca ante la opinión pública?"

N.Y. S.2d 533, 536 (1978), en donde se puntualizó que: "Opinions, false or not, libelous or not, are constitutionally protected and may not be the subject of private damage actions, *provided that the facts supporting the opinions are set forth.*" (Énfasis suplido.)

En resumen, entendemos que como no son libelosas las manifestaciones hechas por el demandado Paniagua Diez, lo procedente es desestimar la demanda por dicho fundamento; no existe necesidad alguna de entrar a discutir si el demandante Oliveras es o no una "figura pública" o si cuenta o no con prueba que demuestre que Paniagua actuó con malicia o con grave menosprecio de la verdad.