Héctor PAGÉS, Jr., Plaintiff,

v.

Manuel FEINGOLD, Defendant.

Civil No. 94–2607 (JAF).

United States District Court,
D. Puerto Rico.

June 11, 1996.

Jesus E. Cuza–Abdala, Goldman Antonetti & Cordova, San Juan, PR, for Plaintiff.

Harry R. Segarra–Arroyo, San Juan, PR, Harry Hertzberg, Bronx, NY, for Defendant.

### OPINION AND ORDER

FUSTE, District Judge.

This is a diversity action initiated by Héctor Pagés against Manuel Feingold, for defamation and damages under the Civil Code of Puerto Rico, Section 1802, 31 L.P.R.A. § 5141. The parties are of diverse citizenship, Puerto Rico and New York–New Jersey, and the amount in controversy exceeds $50,000, exclusive of interests and costs. 28 U.S.C. § 1332.

The case was tried before the court on May 28 and 29, 1996, after the plaintiff waived his right to a jury trial. The waiver was entered after the court struck defendant's pleadings and entered his default for failure to comply with various court orders regarding discovery and legal representation. These orders were entered by the Honorable James L. Watson, Senior Judge, U.S. Court of International Trade, and by the undersigned. See Order entered May 9, 1996, Docket Document No. 36. By the time trial commenced, the defendant had not taken any affirmative steps to actually cure his discovery default, a fact that would have had great weight in any request for reconsideration of the sanction imposed. See Motion and Order entered at the margin thereof, Docket Document No. 37. Unfortunately, the defendant did not comply as expected.

On the basis of the evidence received at trial, the court finds that defendant Manuel Feingold intentionally and maliciously caused the mailing of several letters subscribed by him to several commercial, banking, and governmental entities in Puerto Rico, falsely accusing Héctor Pagés of engaging in a criminal conspiracy with organized crime, including money laundering and related investments in a real estate development in Puerto Rico. The charges included corruption and fraud, as well as Pagés' alleged participation in a scheme of illegal banking practices, including the procurement of fraudulent title over land. The court further finds that the purpose behind the letters was to extort Pagés into settling a dispute over the title of land in a project known as Brisas de Canóvanas.

The opinion first outlines the court's findings of fact, followed by the pertinent conclusions of law. Fed.R.Civ.P. 52.

### I.

Héctor Pagés is a naturalized American citizen who came to the United States as a Cuban refugee in the year 1960. Mr. Pagés was educated in Cuba, where he attended law school at the University of Havana, graduating in the year 1953. Before his arrival in the United States, Mr. Pagés worked in a family business that included sugar cane, cattle, and mining. He has been married to Inés María Lloréns, a librarian, for the last forty-three years and has resided in Puerto Rico since 1964.

After his relocation in Puerto Rico, Pagés took employment with Interstate General Corp., a company that was engaged in the development of land and the building of homes in Puerto Rico. His work at Interstate lasted for about a year. Thereafter, Pagés started his own real estate business. This brought him into contact with a landowner who wanted to sell land. The landowner, Engineer Samuel Angeli, and Pagés got together and developed the land into a successful real estate housing venture sold as the Riverview Urbanization in Bayamón, Puerto Rico. This launched Pagés into a successful home developing business, specializing in low-income housing of the kind sponsored by several governmental agencies of both the Federal and Commonwealth governments. Pagés has built turnkey projects, Section 8 projects, and FHA housing. The units built exceed four thousand.

Héctor Pagés' business requires a strong interaction with the financial institutions that

provide financing for low-income, social-interest housing. These include the Puerto Rico Housing Bank, a government institution, and private banking institutions, such as Banco Popular de Puerto Rico, Banco Santander, The Chase Manhattan Bank, · N.A., and others. The record reflects that during Pagés' activities as a developer and home builder he has been consistently successful. Pagés has excellent commercial relationships within the banking community in this jurisdiction and has never been denied any financing on account of his solvency or the potential success of his projects.

Recently, Mr. Pagés has expanded his real estate business, and at present is a participant in an $87 Million-plus venture for the construction of the Ritz Carlton Hotel in Isla Verde, Puerto Rico. The record reflects that Pagés, a successful businessman, has retained a private figure status and is not a public figure as defined by Puerto Rico case law. His success in business has brought about recognition within business and commercial circles. His photo has only appeared in newspapers circulating in Puerto Rico on two occasions in reference to the Ritz Carlton Hotel project. Mr. Pagés, as the local investor in the Ritz Carlton Hotel project, has been asked to represent his stateside associates and express their views regarding the pending review of casino and gambling legislation, which has a direct effect on the viability of the Ritz Carlton Hotel project. These participations as a private figure do not reach the threshold required to declare Pagés a public figure for purposes of the present defamation action.

During the year 1993, Héctor Pagés purchased a tract of land in Canóvanas, Puerto Rico, from a company known as Desarrollos Modernos. The purchased land was to be developed in phases into a low-income housing urbanization to be known as Brisas de Canóvanas.

On or about December 20, 1993, Héctor Pagés first came into contact with defendant, Manuel Feingold. Feingold claimed having an interest in the title of the property sold by Desarrollos Modernos and mention was made of the apparent fact that a $1.00 sale by Feingold of his interest to Desarrollos Modernos did not deprive him of title over the property and of an interest in the eventual development of the project. By the time that Feingold first contacted Héctor Pagés with his claim, Pagés had already secured a clean title over the land from Desarrollos Modernos and had obtained the necessary financing with Banco Santander to go ahead with the first phase of the project. Both Pagés and Banco Santander had independently verified the title to the property. The same was registered to Pagés' business and both Pagés and Banco Santander had successfully obtained separate title insurance to protect their respective investments. There appeared to be no lien or other interest in favor of Manuel Feingold.

Pagés took note of Feingold's claim and brought it to the attention of lawyers who, in turn, confirmed that a subsequent title search showed no lien running in favor of Manuel Feingold. The record shows that, as of this date, Manuel Feingold has not brought to the attention of Héctor Pagés any document or other hard evidence of title or interest in the Brisas de Canóvanas land or the housing development. Pagés went ahead with his business as usual until the Puerto Rico Housing Bank received a defamatory letter subscribed by Feingold, accusing Pagés of the criminal involvement mentioned above.

The Puerto Rico Housing Bank had a commitment to provide the permanent financing to the buyers of houses in Brisas de Canóvanas. Upon receipt of the September 29, 1994, letter, the Bank's President, attorney Mildred Goyco, referred the matter to the Secretary of Justice of Puerto Rico for investigation. Even though Ms. Goyco found it difficult to believe the accusations of wrongdoing against Pagés, she found it imperative to refer the matter to Justice. After all, social-interest housing and state funds were involved and a claim had been made that Pagés and some of his partners had association with the mob and that fraud, money laundering, and other criminal activities surrounded the social-interest housing project.

The record reflects that Manuel Feingold's letter attack upon the reputation and good name of Héctor Pagés did not abate and

continued on a steady basis until April 1996. Defamatory letters were also sent to Banco Santander, Banco Popular de Puerto Rico, The Chase Manhattan Bank, N.A., and the Puerto Rico Department of Housing, to the attention of Secretary of Housing Carlos Vivoni. Other letters were sent to the Secretary of Treasury, to John Anderson, one of Mr. Pagés' partners in the Ritz Carlton Hotel project, and to other financial institutions that conducted business with Pagés.

The first defamatory letter received by Mildred Goyco as President of the Puerto Rico Housing Bank, made reference to the fact that a well-reputed San Juan attorney, Carlos Quilichini, was acting as Feingold's counsel and that he had the necessary evidence to confirm the charges made. Ms. Goyco called attorney Quilichini and inquired, only to find out that he had no evidence or knowledge about the imputations. Attorney Quilichini testified that he represented Feingold in Puerto Rico for the period January 1993 to February 1995 and never came into knowledge of Pagés' alleged criminal involvement or the veracity of the accusations. Attorney Quilichini severed his relations with Manuel Feingold and wrote disclaimer letters to those entities and public officials to whom Feingold had represented that Quilichini was ready to corroborate the defamatory allegations.

Manuel Fernández, a Chase Manhattan Bank Vice–President, testified to the good commercial reputation of Pagés and to his trustworthiness as a businessman. Chase also received similar letters about Pagés, subscribed by Feingold, alleging that Pagés was mob related and maintained association with underworld figures. The bank also received a letter where Feingold falsely charged that Banco Santander had disassociated itself from Pagés. Mr. Fernández called Pagés, confronted him with the allegations, and heard his side of the story. Regarding a pending loan application, Chase asked Pagés not to continue the loan process, pending resolution of the matter. As late as April 1996, Mr. Fernández had seen other letters by Feingold of similar defamatory nature.

The same way that Chase held back on its continued relationship with Pagés, the Secretary of Housing, Carlos Vivoni, gave specific instructions that all matters involving Pagés and his projects be first cleared by the legal department at the Housing Department. Mildred Goyco, as President of the Housing Bank, testified that this measure was extraordinary and that this was the only case in the recent past where such guarded consideration has been ordered to protect the interest of the Housing Bank.

One of Feingold's letters reached John Anderson, of BP Capital, the principal investor behind the Ritz Carlton Hotel project, days before the closing of the business deal. The receipt of the letter delayed the closing, and Pagés had to bring his lawyers and assure his Ritz Carlton partners of the falsity behind the allegations. Only then did the closing proceed. In addition, Feingold wrote circular letters to buyers at the Brisas de Canóvanas project, raising doubt about the soundness of their titles. Pagés had to address innumerable requests for explanations and assurances. As a result of these continuous defamatory communications over a period of almost two years, Pagés had to engage in an affirmative crusade to defend his reputation and was forced to explain the situation over and over again to various individuals and financial forums. While no bank withdrew approved financing, Chase withheld action and asked Pagés not to pursue a pending project with them. Pagés had to appear before the Puerto Rico Department of Justice during an investigation of the matter and has suffered, thereby, great embarrassment and inconvenience. His testimony at trial, as well as his demeanor, confirm the above. Upon explaining to the court the virulent attacks by Feingold on his reputation and the embarrassment and pain that he and his family endured, Pagés had an uncontrollable outburst of emotion that confirmed to this court the deep sadness and sense of frustration that he experiences when the subject is discussed. Pagés appears to be of very strong emotional constitution, but, even so, he appeared battered and permanently scarred by these sad incidents. He seemed so affected that the court seriously consid-

ered adjourning the case to allow Mr. Pagés to regain his composure.[1]

The court further finds that the letters received in evidence are clearly baseless, malicious, and intended to cause damages. A reading of those of Feingold's letters entered in evidence confirms their defamatory content. *See Plaintiffs' Exhibit Nos. 1, 4, 5, 10–b, 12, 15, 18, and 21.*

Lastly, the court finds that these defamatory letters are part of a strategy by Feingold to force a settlement over Feingold's claim of title and interest over the Brisas de Canóvanas project. That matter is presently pending in separate litigation before another judge of this court. Plaintiffs' Exhibit Nos. 16 and 17 confirm this extortion attempt. Exhibit 16, dated March 28, 1996, directed to Pagés and subscribed by Feingold, reads as follows:

> Is it now time that we talked to one another as mature gentlemen or would you prefer that matters escalate and become worse? What has truly been accomplished since I first discussed our problems in early December 1993.

> Wishing you the very best of health and success.

> Most respectfully yours

> Manuel

> P.S. Please do not misunderstand occasional kindness for weakness. I can easily be your very best "friend" or your very worst enemy. Do you care to discuss peace? This is not a challenge but simply an "olive branch".

> This is strictly for discussion purposes only and may not be utilized for any other purpose whatsoever. Draft.

The letter also contains a hand-written note which reads: "Do you believe in 'damage control.' "

Exhibit 17, dated April 29, 1996, directed to Mr. Pagés and subscribed by Mr. Feingold, reads as follows:

> Hopeful that this note finds you and your family in the very best of health and that all your projects are progressing rapidly and on a very successful path.

> Enclosed you will find three articles that I thought you would find informative and of special personal interest. These are sent to you in good faith and good will.

> 1—Wall Street Journal—April 26, 1996—Page One—Painful Figures (I found that you and I have very much in common in this article with our foreign heritages, striving for education, hard work, and fairness in all our dealings)

> 2—The New York Times,—April 28, 1996—Page E–5—The Non–Cash Value of $43,000,000. " ... he accidentally raised a truth about such awards. They chain together the fates of victim and perpetrator, making them more alike ...". (Our friend Jesus Cuza had referred to you as a "victim".) Perhaps we are both victims, if you stop to think about that for one moment.

> 3—The New York Times—April 28, 1996—"Goetz's Attackers Should Have Known Risks". Do you find any parallels in this article. I most certainly do!

> When you are ready to consider the big picture and the implications of all of our past disputes, you will find that we can much more readily be at least respectable gentlemen than adversaries and/or enemies—which wastes a lot of time, effort, reputation, money, risks versus rewards etc.

> Once again, wishing you the very best, I remain,

> Most respectfully yours,

> Manuel

> This is a draft for discussion purposes only. Not to be used in any other content whatsoever.

It is evident from Plaintiffs' Exhibit Nos. 16 and 17, that Mr. Pagés received a clear message—Pagés should practice damage control and should understand what an enemy can do. He should not let the matter

---

1. Few judges have had the experience of having a witness die from a heart attack suffered under the stress of trial testimony. This judge went through such an experience a few years ago. In the midst of his testimony, a party to the pro-ceeding died from a heart attack brought on by the stress of the situation. When Mr. Pagés crumbled as he testified, the court grew concerned that his testimony, equally heartfelt, might prove equally damaging.

escalate further and become worse, he should discuss peace, consider the big picture, and understand that, otherwise, effort, **reputation,** money and risks are lost or incurred.

Extortion is the procurement of property from another induced by wrongful use of actual or threatened fear. Extortion takes place when a person purposely tries to obtain money from another by threatening to inflict some harm that would not benefit the actor. In addition, the mailing of threatening communications with intent to extort from any person any money or other thing of value is a federal offense. Section 876 of Title 18 of the United States Code provides that,

> [w]hoever, with intent to extort from any person any money or thing of value, knowingly so deposits or causes to be delivered, ..., any communication ... addressed to any other person and containing any threat to injure the ... reputation of the addressee, shall be fined under this Title or imprisoned not more than two years or both.

18 U.S.C. § 876.

In the civilized world, citizens do not resort to defamation and threats to bring about action or the resolution of an ongoing legal dispute. American courts are empowered to assume that task for the benefit of the adverse parties. As a matter of fact, this court finds that Feingold's defamatory, intentional, and malicious communications were directed at damaging Mr. Pagés' reputation and would only stop if Pagés came to terms with Feingold.

■ As a result of the above, the court finds that plaintiff Héctor Pagés has suffered moral damages, inconveniences, and embarrassment, compensable under Puerto Rico law, in the amount of $125,000.

## II.

■ The right to pursue redress for defamation under Puerto Rico law emanates from Article II, Section 4, and Article II, Section 8, of the Puerto Rico Constitution. Section 4 provides in its pertinent part that no law shall be made abridging the freedom of speech or of the press. Section 8 complements the freedom of speech and press by stating that "[e]very person has the right to the protection of law against abusive attacks on his honor, reputation and private or family life." *González Martínez v. López*, 118 D.P.R. 190, 192 (1987). Defamation-case analysis requires the balancing of these competing rights of free speech and free press against the right to be free from abusive attacks to one's reputation. *González Martínez*, 118 D.P.R. at 192.

■ In a defamation case, the plaintiff must prove that the published information is false and that the act of defamation has caused damages. The law also requires a legal determination as to whether the victim of the defamatory attack is a private figure or a public figure. In cases involving a private figure claimant, plaintiff need only prove that the author of the defamatory statement was negligent as this concept has been interpreted under Section 1802 of the Civil Code, 31 L.P.R.A. § 5141. With respect to public figures who suffer a defamatory attack, plaintiff must prove real malice and gross disregard of the truth. *Oliveras v. Paniagua Diez*, 115 D.P.R. 257, 262 (1984); *González Martínez*, 118 D.P.R. at 192–93.

The Supreme Court of Puerto Rico has established the necessary criteria for analysis in determining the peculiar characteristics behind the concept of the public figure. In *Sociedad de Gananciales v. López*, 116 D.P.R. 112 (1985), the Supreme Court followed a functional approach to determine whether the plaintiff was a public figure, the test requiring a public interest balance between freedom of information and the public status of the aggrieved party. Other Puerto Rico Supreme Court cases highlight the unique characteristics of the public figure. *Clavell v. El Vocero de Puerto Rico*, 115 D.P.R. 685 (1984); *Oliveras v. Paniagua Diez*, 115 D.P.R. 257 (1984); *Pueblo v. Olivero Rodríguez*, 112 D.P.R. 369 (1982); *García Cruz v. El Mundo, Inc.*, 108 D.P.R. 174 (1978); *Torres Silva v. El Mundo, Inc.*, 106 D.P.R. 415 (1977).

■ In *González Martínez*, 118 D.P.R. at 195, the Supreme Court states that the following elements must be present for a party to be considered a public figure: (1)

special prominent social status; (2) capacity to exercise influence and persuasion in the discussion of matters of public interest, and (3) active participation in the discussion of specific public controversy with the purpose of swinging the balance in the process of decision. The Puerto Rico Supreme Court also recognizes other types of public figures described in federal case law, including *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S.Ct. 2997, 3009–10, 41 L.Ed.2d 789 (1974). These include persons who, on account of public office, the exercise of power, or involvement in public or political matters have acquired fame or notoriety in the community. *See also Padilla v. WKAO Radio,* —— D.P.R. ——, 96 J.T.S. 26 (March 7, 1996); *Porto v. Bentley Puerto Rico, Inc.,* —— D.P.R. ——, 92 J.T.S. 175 (Dec. 23, 1992); *Jiménez Alvarez v. Silén Maldonado,* —— D.P.R. ——, 92 J.T.S. 95 (June 30, 1992).

■ On these principles, the court finds that Héctor Pagés is not a public figure and must be classified as a private citizen for purposes of the present defamatory action. Mr. Pagés is a businessman with no active participation in Puerto Rico's political life structure. While it is true that he is well-known within the real estate business community as a developer of social-interest housing, his business role does not carry prominence and notoriety in the Puerto Rico society or government. His business dealings carry less notoriety than that ascribed to any bank executive or other business executive in our commercial community. The fact that Héctor Pagés is a partner in the Ritz Carlton Hotel project does not affect his otherwise private status, since hotel ownership, investment or management are not associated in the Puerto Rico community with special social status or public and political participation. The fact that his photo has appeared twice in *Caribbean Business,* a newspaper of limited circulation, and in the *El Nuevo Día* Business Section, regarding the hotel project, is of little or no relevance other than to the few persons who have an interest in this kind of project or in real estate development. Pagés' participation as a Ritz Carlton Hotel partner in a lobbying effort regarding the pending amendments to the gambling laws means nothing in terms of social, public or political notoriety. He simply is a minority, Spanish-speaking partner who Mr. John Anderson, the Ritz Carlton Hotel and Casino principal, used as his mouthpiece to convey the Ritz Carlton Hotel and Casino's position regarding the hotel investment and its success under the proposed casino and gambling law. *See Torres Silva v. El Mundo, Inc.,* 106 D.P.R. 415 (1977) (Pepito Torres, a famous popular music orchestra director, was found not to be a public figure, even though his orchestra made recordings for commercial sale and participated for fifteen years in a prime-time radio and T.V. show, his name appeared in various magazines and newspapers for years, and he was interviewed by a famous T.V. producer in his show).

## III.

■ In sum, the court finds that Mr. Pagés was the object of defamatory and false imputations subscribed and mailed by Mr. Manuel Feingold to several members of Puerto Rico's business community and the Puerto Rico government. The publication was malicious and made intentionally with great disregard for the truth. The defamatory actions by Feingold are not only negligent actions under Section 1802 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 5141, they also constitute actionable conduct even if Pagés was a public figure. Damages to plaintiff Héctor Pagés' reputation were caused as previously explained and, under Puerto Rico case law, damages of a moral nature are to be compensated. While it is true that Mr. Pagés did not visit a psychiatrist to receive therapy for suffering, one need not make a damage assessment or calculation involving defamation and moral suffering with mathematical precision. Puerto Rico law grants trial judges the necessary discretion on the basis of their experience to make the damage assessment. *See Elba A.B. v. University of Puerto Rico,* 125 D.P.R. 294, 321–28 (1990) (and cases cited therein). The damage award also considers what is obvious. As Benjamin Franklin once said, "Glass, China, and Reputation, are easily crack'd, and never well mended."

Judgment to enter.

**IT IS SO ORDERED.**