EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| David Gómez Márquez; Juanita Morrabal Cintrón y Gilberto Burgos López<br><br>Peticionarios<br><br>v.<br><br>Periódico El Oriental Inc. h/n/c El Regional de Guayama; Sucesión de Vicente Pierantoni, Presidente y Editor, compuesta por Vicente Pierantoni González; Miguel A. Pierantoni González; Magda Pierantoni González; Juan R. Pierantoni González; Alberto Cruz, Administrador; Aseguradora ABC<br><br>Recurridos | Certiorari<br><br>2020 TSPR 03<br><br>203 DPR \_\_\_\_ |

Número del Caso: CC-2018-967

Fecha: 14 de enero de 2020

Tribunal de Apelaciones:

    Región Judicial de Guayama, Fajardo y Humacao

Abogado de la parte peticionaria:

    Lcdo. Rafael A. Nadal Arcelay
    Lcdo. Edgardo Pabón Rodríguez

Abogado de la parte Recurrida:

    Lcdo. Juan A. Vélez Méndez

Materia: Daños y Perjuicios – Distinción del funcionario público de la figura pública en casos de difamación.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| David Gómez Márquez; Juanita Morrabal Cintrón y Gilberto Burgos López<br><br>Peticionarios<br><br>v.<br><br>Periódico El Oriental Inc. h/n/c El Regional de Guayama; Sucesión de Vicente Pierantoni, Presidente y Editor, compuesta por Vicente Pierantoni González; Miguel A. Pierantoni González; Magda Pierantoni González; Juan R. Pierantoni González; Alberto Cruz, Administrador; Aseguradora ABC<br><br>Recurridos | CC-2018-0967 | |

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES

En San Juan, Puerto Rico, a 14 de enero de 2020.

Nuestra jurisprudencia no ha sido clara al distinguir el funcionario público de la figura pública en casos de difamación. Este caso, sobre una demanda por difamación presentada por tres empleados del Departamento de Educación, nos permite evaluar la figura del funcionario público. No obstante, dadas las razones que expondremos, concluimos que los aquí demandantes no deben considerarse funcionarios públicos que tengan que probar malicia real para prosperar en su demanda. Además, resolvemos que su causa de acción por difamación cumple con el estándar mínimo de negligencia. Por ello, revocamos el dictamen del Tribunal de Apelaciones.

I

Entre enero y febrero de 2005, el periódico El Oriental h/n/c El Regional, de Guayama, publicó una serie de tres reportajes titulada "Se roban $100 mil en el DE". En ellos, se denunció un esquema de fraude en el Distrito Escolar de Guayama.

El primer reportaje expuso que la investigación del periódico había identificado a por lo menos un autor intelectual de los robos, el Sr. Luis R. Santos Cintrón, con la participación de tres personas. A. J. Cruz, "'Pusieron el cabro a velar a las lechugas': Esquema de F[r]aude", El Regional de Guayama, 26 de enero de 2005. El periódico detalló que el señor Santos Cintrón era, al mismo tiempo, conciliador y pagador de los componentes fiscales de las escuelas del distrito, y que ello contravenía el manual de procedimiento que rige la composición fiscal en las escuelas de la comunidad. En lo referente a los tres demandantes de este caso, se indicó que el Sr. David Gómez Márquez, con la recomendación de la Sra. Juanita Morrabal Cintrón y el visto bueno del Sr. Gilberto Burgos López, fue quien propuso que el señor Santos Cintrón realizara la doble función. Para aquel momento, el señor Gómez Márquez ejercía como supervisor regional de los componentes fiscales del Departamento de Educación en la región de Caguas; la señora Morrabal Cintrón fungía como Superintendente de Escuelas del Distrito Escolar de Guayama, y el señor Burgos López era

superintendente auxiliar. El resto del artículo se dedicó a explicar el esquema del señor Santos Cintrón.

En un segundo reportaje, se denominó a los señores Gómez Márquez y Burgos López, y a la señora Morrabal Cintrón, como los "principales arquitectos [del] fraude", por ser las personas que recomendaron que el señor Santos Cintrón ocupara dos posiciones en un componente fiscal. A. J. Cruz, "Escuelas de la comunidad: Un planificado fraude", El Regional de Guayama, 2 de febrero de 2005. Se mencionó que el señor Santos Cintrón fue hombre de confianza de la Superintendente Escolar sin que, al parecer, la señora Morrabal Cintrón se diera cuenta de sus jugadas. También se señaló que, dentro del Departamento de Educación en Guayama, el señor Santos Cintrón parecía intocable por la protección que recibía de la señora Morrabal Cintrón y del señor Burgos López. Finalmente, se indicó que ni a la señora Morrabal Cintrón ni al señor Burgos López les entró curiosidad por saber de dónde el señor Santos Cintrón sacaba tanto dinero. En el resto del artículo se dan otros detalles de cómo el señor Santos Cintrón lograba cambiar los cheques y usarlos para su beneficio.

El tercer reportaje comenzó explicando el esquema de robo como uno llevado a cabo por "un individuo, con la complicidad de algunos funcionarios". A. J. Cruz, "Larga la condena", El Regional de Guayama, 16 de febrero de 2005. Señaló que, mientras autoridades locales y federales desarrollaban su investigación del esquema, desde las

oficinas de la Región Educativa de Caguas, que dirigía la Sra. Aida Berríos, y donde trabajaban los señores Gómez Márquez y Burgos López, y la señora Morrabal Cintrón, se inició una "cacería de brujas" contra los funcionarios sospechosos de colaborar con la investigación. Mencionó algunos eventos anteriores a este en el que la señora Berríos encubrió escándalos ocurridos durante su incumbencia. Finalizó concluyendo que las lagunas en las explicaciones sobre cómo operaba el esquema de fraude apuntaban a que el señor Santos Cintrón no actuó solo, y que la Fiscalía y la Policía debían darle más atención al caso.

Los señores Gómez Márquez y Burgos López, y la señora Morrabal Cintrón enviaron una carta al periódico el 19 de mayo de 2005 para exigir que se rectificara la información. Alegaron que las imputaciones a ellos eran falsas y les ocasionaban daños. El 13 de julio de 2005, El Regional publicó una nota editorial en la que negó que la serie publicada señalara a los tres funcionarios como participantes del fraude, sino que se les denominó "arquitectos" del esquema porque eran los "custodios y supervisores" inmediatos del señor Santos Cintrón. Así, criticó a los tres implicados por no ejercer sus funciones a cabalidad, pues entendió que debieron señalar a las autoridades pertinentes la irregularidad de mantener a una misma persona en funciones conflictivas. Además, reiteró que las investigaciones de las autoridades no habían culminado.

Por otro lado, ese mismo día, el periódico publicó otro reportaje sobre la entrevista hecha al inspector de la Policía de Guayama asignado a investigar el caso. A. Román González, "Investigación de fraude: podría vincular funcionarios", El Regional de Guayama, 13 de julio de 2005. El inspector indicó que la investigación continuaba porque aparentemente el señor Santos Cintrón no había actuado solo, pero que no había prueba suficiente para radicar cargos contra otros funcionarios.

El 23 de enero de 2006, los señores Gómez Márquez y Burgos López, y la señora Morrabal Cintrón, demandaron al periódico, a su presidente y editor, y al periodista que escribió el reportaje. El Tribunal de Primera Instancia concluyó que no hubo difamación y dictó sentencia sumaria a favor del periódico. El Tribunal de Apelaciones confirmó. El 23 de diciembre de 2011, revocamos al Tribunal de Apelaciones, por entender que existía controversia sobre hechos materiales y que no procedía la sentencia sumaria. Devolvimos el caso al foro primario para que determinara si los implicados eran figuras públicas o privadas y que continuaran los procesos.

Tras varios trámites procesales, el Tribunal de Primera Instancia celebró el juicio en su fondo entre septiembre y diciembre de 2015 y declaró con lugar la demanda. Decretó que los implicados eran figuras privadas y, aunque bastaba probar que las publicaciones fueron hechas con negligencia, determinó que hubo malicia real de parte del periódico. En

su sentencia, se destacan los testimonios de la Sra. Hilda Pomales Figueroa y de la Sra. Sonia Meléndez Lugo, quienes fueron secretarias de la señora Morrabal Cintrón para la fecha de los reportajes. Ap. Sol. Cert., págs. 240-241. Las dos secretarias declararon que el señor Santos Cintrón no hacía trabajos para la señora Morrabal Cintrón y que esta no era responsable de supervisarlo. Íd. Del testimonio del señor Cruz de Jesús, autor de los reportajes, se enfatizó que este realizó la investigación sin ayuda de otras personas, que toda la información obtenida en la investigación apuntaba al señor Santos Cintrón como responsable del fraude, y ninguno de los documentos en su poder relacionaba a los señores Gómez Márquez y Burgos López, y la señora Morrabal Cintrón, con el esquema delictivo. Íd., págs. 241-243. El foro primario confirió entera credibilidad a los testimonios del señor Gómez Márquez y la señora Morrabal Cintrón y destacó que estos no fueron refutados por la parte contraria. Íd., pág. 248.

Concluyó que lo publicado referente a los señores Gómez Márquez y Burgos López, y la señora Morrabal Cintrón, era falso. Razonó que la prueba que El Regional obtuvo en su investigación solo ataba al señor Santos Cintrón con el esquema de fraude y no a los otros tres funcionarios mencionados. Además, enfatizó que estos tres funcionarios tampoco tenían la autoridad o la responsabilidad de supervisar al señor Santos Cintrón.

El periódico acudió al Tribunal de Apelaciones y solicitó la revocación del dictamen del foro inferior. Alegó que el Tribunal de Primera Instancia erró en concluir que: (1) el señor Gómez Márquez y la señora Morrabal Cintrón eran personas privadas; (2) el periódico actuó negligentemente; (3) no eran de aplicación las doctrinas de hipérbole retórica y opinión; (4) procedía que el dueño del periódico respondiera en su carácter personal, y (5) al imponer honorarios de abogado por litigar temerariamente.

El Tribunal de Apelaciones analizó el contenido de los reportajes y lo contrastó con las expresiones del señor Gómez Márquez y la señora Morrabal Cintrón durante los interrogatorios y contrainterrogatorios del juicio. Resolvió que las determinaciones de hecho del foro primario no le merecían deferencia. Respaldándose en citas puntuales de la transcripción de las vistas, concluyó que los implicados reconocieron que los artículos decían cosas verdaderas y que identificaban al señor Santos Cintrón como el autor intelectual del fraude. Sostuvo que las inferencias que pudieran derivarse de la mención del señor Gómez Márquez y la señora Morrabal Cintrón en los reportajes, se disuelven con las expresiones categóricas, en el mismo artículo, respecto a que el señor Santos Cintrón fue el único que robó. Finalmente, entendió que no es difamatorio señalar que los implicados recomendaron para un puesto a una persona que luego delinquió; indicar que los eventos ocurrieron mientras los implicados ocupaban plazas administrativas en la región

de los eventos, ni declarar que los implicados no se dieron cuenta del esquema de fraude.

Solo el señor Gómez Márquez y la señora Morrabal Cintrón solicitaron la revisión de la sentencia. Plantearon que el Tribunal de Apelaciones abusó de su discreción al resolver que: (1) los demandantes no probaron su acción de difamación; (2) no se probó malicia real de parte de los demandados; (3) la parte demandada no obró con temeridad, de manera que procediera cobrarles honorarios de abogado, y (4) el presidente del periódico no era responsable civilmente.

Con los alegatos de cada parte, el caso quedó sometido en los méritos para su adjudicación.

II

"[L]a tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada, lo cual incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz". Dávila Nieves v. Meléndez Marín, 187 DPR 750, 771 (2013). De ahí que "los tribunales apelativos no intervendremos con la apreciación de la prueba, la adjudicación de credibilidad y las determinaciones de hechos que realizan los tribunales de instancia, a menos que se demuestre que el juzgador actuó movido por pasión, prejuicio o parcialidad o que incurrió en error manifiesto". Íd., pág. 753. Para entender mejor esta norma, conviene separar sus dos categorías principales. Por

un lado, están la pasión, prejuicio o parcialidad. Por el otro lado, está el error manifiesto.

Cuando la alegación es de pasión, prejuicio o parcialidad, los foros apelativos debemos verificar primordialmente si el juez de primera instancia cumplió su función de adjudicar de manera imparcial, pues solo así podremos descansar en sus determinaciones de hechos. Dávila Nieves v. Meléndez Marín, supra, pág. 777. La pasión, el prejuicio o la parcialidad que puede dar base a revocar un dictamen no surge necesariamente de algún conflicto previo entre el adjudicador y una de las partes, sino que tiende a manifestarse durante el proceso mismo. Íd., págs. 775-776.

En cambio, el error manifiesto ocurre cuando, de un análisis de la totalidad de la evidencia, el tribunal apelativo queda convencido de que se cometió un error, aunque haya evidencia que sostenga las conclusiones de hecho del Tribunal. Méndez v. Morales, 142 DPR 26, 36 (1996). "[C]uando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida, las consideraremos claramente erróneas". Íd. Se incurre en un error manifiesto cuando la apreciación de esa prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble. Pueblo v. Toro Martínez, 200 DPR 834, 859 (2018). Ello es particularmente cierto cuando el tribunal descansa exclusivamente en una parte de la prueba, mientras hubo otra prueba que la contradijera. Véase Méndez v. Morales, supra, pág. 37.

El foro apelativo intermedio no especificó en su sentencia si fue pasión, prejuicio o parcialidad, o error manifiesto, lo que le movió a negarle deferencia al foro primario. Explicó de manera general el derecho referente a estos conceptos y luego concluyó que las determinaciones de hecho del foro primario no le merecían deferencia porque no comulgaban con el derecho. Ello nos da a entender que, según el Tribunal de Apelaciones, el foro primario incurrió en error manifiesto.

Sin embargo, el error que hace desechable la deferencia al foro sentenciador debe ser, como dice el concepto, manifiesto. Este estándar de revisión restringe nuestra facultad para sustituir el criterio del foro primario a escenarios en que, de la prueba admitida, no exista base suficiente que apoye su determinación. Pueblo v. Toro Martínez, supra, pág. 859. Diferencias de criterio jurídico no alcanzan ese estándar.

En el caso ante nos, el Tribunal de Primera Instancia hizo determinaciones consecuentes con la prueba que evaluó. Estas no son inherentemente increíbles o imposibles; tampoco están en conflicto con el balance más racional de toda la prueba presentada. Estamos así ante un caso de diferencia de criterio entre el foro primario y foro apelativo intermedio; no ante un caso donde haya mediado pasión, prejuicio o parcialidad, o error manifiesto. Por ello, concluimos que el foro intermedio no debió sustituir su evaluación de la prueba por la del foro primario.

En los casos de difamación de un funcionario público, hemos dicho que los tribunales apelativos deben sopesar la prueba por sí mismos y de manera independiente, para probar si se estableció malicia real de manera clara y convincente. Meléndez Vega v. El Vocero de PR, 189 DPR 123, 153-154 (2013). No obstante, debemos dar deferencia al juzgador de los hechos en cuanto a la credibilidad de los testigos. Íd., pág. 154. En el caso ante nos, el Tribunal de Apelaciones no prestó deferencia al foro primario en cuanto a la credibilidad de los testigos. Varios testimonios fueron cruciales para las determinaciones de instancia, particularmente aquellos referentes a que los demandantes no ocupaban cargos de tal importancia que ameritara que se les considerara como funcionarios públicos.

Como comentario final en cuanto al tema de la deferencia, el Tribunal de Apelaciones debe abstenerse de elaborar sobre la pasión, prejuicio y parcialidad, si no puede fundamentar que ello ocurrió en el caso ante su consideración. "[Q]uien señale que el juzgador actuó mediando pasión, prejuicio o parcialidad debe sustentar sus alegaciones con evidencia suficiente, pues estas no deben convertirse en un instrumento para ejercer presión contra el Tribunal de Primera Instancia". Dávila Nieves v. Meléndez Marín, supra, pág. 775.

III

Este caso nos requiere atender una figura definida exiguamente en los casos de difamación en las Decisiones de

Puerto Rico, a saber: el funcionario público. Las acciones de difamación plantean la necesidad de balancear el derecho a la libre expresión y la libertad de prensa, que comprende el interés del Pueblo en fomentar el debate vigoroso sobre cuestiones de interés público, y el derecho a la intimidad de los individuos. Véase Const. PR, Art. II, Secs. 4 y 8, 1 LPRA; Maldonado y Negrón v. Marrero y Blanco, 121 DPR 705, 713 (1988); González Martínez v. López, 118 DPR 190, 192 (1987).

La jurisprudencia federal ha establecido unas guías constitucionales para determinar en qué momentos el derecho a la libre expresión debe prevalecer o ceder. De ahí las distinciones entre las distintas personas públicas y privadas. Existen varias subcategorías entre las personas públicas. El funcionario público y la figura pública son las más reconocidas entre ellas. Por eso, de entrada, lo apropiado es hablar de personas públicas, que es el término amplio que incluye tanto al funcionario público como a la figura pública. Sanford, Libel and Privacy 2d, Sec. 7.1 (Supl. 1993).

El caso histórico New York Times Co. v. Sullivan, 376 U.S. 254 (1964), resolvió que no es difamatoria la publicación de comentarios concernientes a la conducta oficial de un funcionario público, aunque resulten falsos, a menos que la información fuera publicada con malicia real, es decir, a sabiendas de que era falsa o con grave menosprecio de si lo era. Esta norma luego se extendió a

figuras públicas cuando la comunidad tiene un interés justificado e importante en la materia objeto de publicación. Walker v. Associated Press, 391 U.S. 966 (1968); Curtis Publishing Co. v. Butts, 388 U.S. 130 (1967).

En Gertz v. Robert Welch, 418 U.S. 323 (1974), se esclareció el derecho aplicable cuando la parte demandante es una persona privada. El Tribunal entendió que las personas privadas son más vulnerables al daño que las personas públicas y que son más merecedoras de resarcimiento. Íd., pág. 345. Por eso, dispuso que los estados podían definir el estándar de responsabilidad apropiado, siempre que exijan al reclamante probar que el demandado actuó con algún grado de culpa. Íd., pág. 347.

Como se aprecia al repasar la norma de los casos citados, los criterios que pesan para reconocer a una persona como funcionario público o como figura pública son distintos. En síntesis, las primeras lo son por el cargo que ocupan; las segundas por la notoriedad que tienen en la sociedad. Sin embargo, no toda persona en la nómina pública es un funcionario público. Hutchinson v. Proxmire, 443 U.S. 111, 119 n.8 (1979). En New York Times Co. v. Sullivan, supra, pág. 283 n.23, el Tribunal se negó a determinar cuán abajo en los escalafones menores del Gobierno se extendía la designación de funcionario público para propósitos del estándar de malicia real. Posteriormente, esbozó algunos criterios en Rosenblatt v. Baer, 383 U.S. 75 (1966). Reconoció que la norma de Sullivan tuvo dos motivaciones:

(1) el compromiso nacional con que el debate público sea robusto y amplio, aunque incluya ataques no agradables, y (2) el interés en el debate sobre las personas que están en posición de influir en la resolución de los problemas públicos. Íd., pág. 85. Cuando una posición gubernamental posee tal importancia aparente que el público tiene un interés independiente en las cualificaciones y ejecutorias del servidor público concernido, más allá del interés general en las condiciones y labor de todos los empleados gubernamentales, se aplican los estándares de Sullivan sobre malicia real. Rosenblatt v. Baer, supra, pág. 86; Maldonado y Negrón v. Marrero y Blanco, supra, pág. 714. Por eso, como mínimo, la designación de funcionario público aplica a aquellos que en la jerarquía gubernamental tienen, o aparentan tener, responsabilidad sustancial o control sobre las ejecutorias del gobierno. Rosenblatt v. Baer, supra, pág. 85. Las expresiones en Rosenblatt han sido objeto de dilatada interpretación judicial, de manera que un gran número de empleados públicos, de distintos niveles, se han considerado funcionarios públicos. Maldonado y Negrón v. Marrero y Blanco, supra, pág. 714.

Los tribunales han usado diversos criterios para determinar qué empleados públicos son funcionarios públicos. El Primer Circuito identificó tres consideraciones de política pública que se repiten en la jurisprudencia. Estas son: (1) reconocimiento de que la Primera Enmienda exige que el debate de los asuntos de importancia pública sea amplio

y robusto; (2) el acceso a los medios que generalmente tienen aquellos que ocupan cargos públicos, lo que les permite defenderse mejor de los ataques en su contra, y (3) el riesgo que se asume al ocupar cargos influyentes en el quehacer público. Kassel v. Gannett Co., Inc., 875 F.2d 935, 939-940 (1er Cir. 2008). El Segundo y el Cuarto Circuito también han atendido la figura del funcionario público, pero se limitaron a citar a Rosenblatt -y a los casos estatales a modo de ejemplo-; sin establecer un test o unas guías más claras para definir al funcionario público. Véase Horne v. WTVR, LLC, 893 F.3d 201, 207 (4to Cir. 2018); Bufalino v. Associated Press, 692 F.2d 266, 272-273 (2do Cir. 1982).

La oportunidad que cierto funcionario público tiene de abusar de la confianza pública depositada en él hace que sus calificaciones sean más importantes para los ciudadanos que las de otros empleados públicos. Sanford, op. cit., Sec. 7.2.2.2 (Supl. 2008). Por ello, si un individuo está íntimamente involucrado en el desembolso de fondos públicos, debe cumplir con el estándar de Sullivan. Íd. Igualmente, si participa en la creación de política pública, sus calificaciones serán materia de interés público. Íd. Otro factor importante es si la publicación presuntamente difamatoria se produjo como parte de un esfuerzo de rendición de cuentas de algún funcionario público en cuanto a sus acciones como tal. Smolla, Law of Defamation 2d (Vol. 1), Sec. 2.100 (2019).

En Puerto Rico, desde Torres Silva v. El Mundo, Inc., 106 DPR 415 (1997), hemos desarrollado un enfoque funcional para determinar si el estándar de Sullivan debe aplicar. Se ha prestado atención particular al contexto específico en que se da la controversia: la naturaleza de la declaración presuntamente difamatoria, el auditorio al que se dirige, los intereses que se sirven o vulneran, así como la relación funcional entre estos factores. Soc. de Gananciales v. López, 116 DPR 112, 117 (1986).

En varias ocasiones hemos clasificado personas como figura pública. Véase Garib Bazain v. Clavell, 135 DPR 475 (1994) [doctor notorio con relación al tema del síndrome de inmunodeficiencia adquirida (SIDA)]; Maldonado y Negrón v. Marrero y Blanco, supra (vicepresidente municipal de un partido político); Clavell v. El Vocero de PR, 115 DPR 685 (1984) (abogado cuyo desaforo recibió mucha publicidad); Oliveras v. Paniagua Diez, 115 DPR 257 (1984) (periodista notorio de deportes); García Cruz v. El Mundo, Inc., 108 DPR 174 (1978) (candidato a alcalde); Aponte Martínez v. Lugo, 100 DPR 282 (1971) (arzobispo). En cambio, véase Torres Silva v. El Mundo, Inc., supra, donde concluimos que Pepito Torres Silva era figura privada, a pesar de que fundó la reconocida Orquesta Siboney y la dirigió por veinte años, y amenizó durante quince años un programa que se transmitía por radio y televisión.

Son menos los casos en que hemos determinado que una persona es funcionario público. Véase Meléndez Vega v. El

Vocero de PR, supra (Directora del Centro Metropolitano de Investigaciones y Denuncias del Departamento de Justicia); Soc. de Gananciales Rodríguez v. El Vocero de P.R., 135 DPR 122 (1994) (Director del Cuerpo de Investigaciones Criminales de la Policía, Región de Ponce); Soc. de Gananciales v. López, 116 DPR 112 (1986) (policía raso); Zequeira Blanco v. El Mundo, Inc., 106 DPR 432 (1977) (Juez de Distrito).

Los demandantes en este caso ocupaban puestos administrativos en el Departamento de Educación. El señor Gómez Márquez era supervisor regional de los componentes fiscales del Departamento de Educación en la región de Caguas y la señora Morrabal Cintrón era Superintendente de Escuelas del Distrito Escolar de Guayama. Muchos tribunales estatales han declarado que los educadores, directores y superintendentes de escuelas públicas son funcionarios públicos que deben cumplir con el estándar de Sullivan. Sanford, supra, Sec. 7.2.3.4 (Supl. 1993); Smolla, supra, Sec. 2.107. Sanford cita decisiones en California, Virginia y Texas que resuelven lo contrario, pero concluye que esos tribunales estatales interpretaron la norma de Rosenblatt de manera muy limitada. Sanford, supra, Sec. 7.2.3.4 (Supl. 1993). Sostiene que esta aplica no solo a aquellos que "controlan" o "gobiernan" desde las altas esferas de la política pública, sino que también se extiende a aquellos con responsabilidad sustancial para conducir asuntos gubernamentales. Íd. ("*the Rosenblatt holding […] extends*

*also to those who have substantial responsibility for the conduct of government affairs. [A] long line of cases […] hold that those who* <u>*execute*</u> *governmental policies and functions are appropriate plaintiffs for application of the* <u>*Sullivan*</u> *standard*"). Sanford sugiere que incluso los encargados de llevar a cabo ("*execute*") los asuntos gubernamentales son funcionarios públicos. Sin embargo, el texto de <u>Rosenblatt</u> que supuestamente respalda esta interpretación explícitamente requiere que se trate de funcionarios con control decisional. <u>Rosenblatt v. Baer</u>, <u>supra</u>, pág. 85 ("*the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs*").

Aunque Sanford asegura que la gran mayoría de las jurisdicciones reconocen a estos empleados como funcionarios públicos, los resultados a los que han llegado los tribunales son variados. Véase, por ejemplo, <u>Smolla</u>, supra, Sec. 2.107 nn. 1 & 12; H. W. Stonecipher & D. Sneed, <u>A Survey of the Professional Person as Libel Plaintiff: Reexamination of the Public Figure Doctrine</u>, 46 Ark. L. Rev. 303, 317-321 (1993); R. E. Johnson, <u>No More Teachers' Dirty Looks--Now They Sue: An Analysis of Plaintiff Status Determinations in Defamation Actions by Public Educators</u>, 17 Fla. St. U. L. Rev. 761 (1990); W. Wat Hopkins, <u>Teachers as Public Officials in Libel Actions</u>, 47 Ed. Law Rep. 353 (1988). Además, en algunas de

estas decisiones los empleados ocupaban puestos electivos a nivel local y en muchas otras los tribunales no explicaron por qué concluyeron que ese empleado era un funcionario público. Véase D. Elder, *Defamation, Public Officialdom and the Rosenblatt v. Baer Criteria —A Proposal for Revivification: Two Decades After New York Times Co. V. Sullivan*, 33 Buff. L. Rev. 579, 626-643 (1984).

Este tema, que tanta discusión ha generado en Estados Unidos, tiene dos episodios en nuestra jurisprudencia. En 1988 atendimos un caso sobre comentarios presuntamente difamatorios contra un Director de Escuela Intermedia. *Maldonado y Negrón v. Marrero y Blanco*, *supra*. No tuvimos que resolver si el cargo de Director de Escuela Intermedia lo convertía en funcionario público, pues el demandante, por su participación en la política, cumplía con los criterios para ser figura pública. *Maldonado y Negrón v. Marrero y Blanco*, *supra*, pág. 714.

Tres años más tarde, en *Villanueva v. Hernández*, 128 DPR 618 (1991), se sugirió que a un maestro de escuela pública debía tratársele con la misma vara que se le aplicó al policía raso en *Soc. de Gananciales v. López*, 116 DPR 112 (1986). En la pág. 639 n.9, dijimos que:

> Una posible cuarta controversia gira en torno a si la señora Villanueva, maestra de una escuela pública en el pueblo de Río Grande, debe considerarse como un "funcionario o figura pública" al momento de dictar sentencia sumaria. […]
> Como es sabido, en *Soc. de Gananciales v. López*, 116 D.P.R. 112 (1985), este Tribunal mayoritariamente resolvió que un policía era un "funcionario público" para efectos de la doctrina

establecida por el Tribunal Supremo federal en <u>New York Times Co. v. Sullivan</u>, ante.

Ciertamente, en el espectro de los funcionarios y figuras públicas, una maestra de escuela pública parece ocupar un lugar igual, o mayor, que un agente del orden público.

En vista del resultado a que llegamos, sin embargo, se hace innecesario contestar dicha interrogante.

Esa nota al calce, sin embargo, no atendió las razones que nos llevaron a adoptar la tendencia estatal mayoritaria de que un policía es un funcionario público. En <u>Soc. de Gananciales v. López</u>, <u>supra</u>, pág. 116-117, citamos jurisprudencia federal y estatal, y reconocimos que los policías rasos son muy visibles al ciudadano común; que tienen la autoridad y la habilidad para hacer uso de la fuerza; que el mal uso de esa autoridad puede resultar en la privación de derechos constitucionales y libertades individuales, incluso lesiones físicas, por lo que la discusión abierta del desempeño y las calificaciones de esos justifican que se les considere funcionarios públicos. Estas consideraciones de política pública no están presentes de igual forma en el caso de un maestro de escuela pública.

También merece atención el último caso en que determinamos que la demandante era funcionaria pública. En <u>Meléndez Vega v. El Vocero de PR</u>, <u>supra</u>, págs. 147-148, observamos que no existía controversia sobre la clasificación de la demandante como funcionaria pública. Dijimos que nos constaba que "dicha designación e[ra] adecuada tomando en cuenta la posición de alta jerarquía de la licenciada Meléndez dentro del Departamento de Justicia,

quien se desempeñaba como Directora del Centro Metropolitano de Investigaciones y Denuncias del Departamento de Justicia". Íd., pág. 148.

El análisis jurisprudencial nos conduce a concluir que ninguno de los demandantes en el caso ante nos debe considerarse funcionario público. El señor Gómez Márquez, como supervisor regional de los componentes fiscales del Departamento de Educación en la región de Caguas, servía de enlace entre los componentes fiscales de los distintos distritos y la oficina central de la región, y brindaba apoyo técnico a los componentes fiscales. Sentencia del Tribunal de Primera Instancia, GDP2006-0011, en la pág. 11. No establecía política pública ni tenía funciones discrecionales, limitándose a las instrucciones impartidas por la agencia. Íd., pág. 13. Tampoco supervisaba al personal de los componentes fiscales de los distritos. Íd., pág. 12.

La señora Morrabal Cintrón fungía como Superintendente de Escuelas III del Distrito Escolar de Guayama. Era la funcionaria de jerarquía más alta en ese distrito. Sin embargo, sus funciones eran ser facilitadora de la docencia y asesorar en asuntos administrativos cuando así lo requerían los directores escolares. Íd., págs. 14-15. No ejercía funciones ejecutivas, fiscalizadoras, de evaluación o supervisión de las escuelas, ni establecía política pública para el Departamento de Educación. Íd., pág. 15.

El Tribunal de Primera Instancia concluyó, correctamente, que ambos son figuras privadas. Amparó su

conclusión en testimonios ofrecidos en el juicio que le merecieron entera credibilidad, tanto por parte de los demandantes como de otros empleados que trabajaban con estos y corroboraron sus testimonios. Como dijimos, el juzgador de los hechos merece deferencia en cuanto a la credibilidad de los testigos. Meléndez Vega v. El Vocero de PR, supra, pág. 154.

Según lo expuesto, concluimos que ninguno de los dos demandantes ocupaba una posición gubernamental de tal importancia que el público tuviera un interés en sus cualificaciones y ejecutorias. Véase Rosenblatt v. Baer, supra, pág. 86. Si nos dejamos guiar por los criterios establecidos por el Primer Circuito, llegamos a la misma conclusión. Aunque la información que El Regional quiso publicar es de importancia pública y, por ello, debe ser debatida amplia y robustamente, los demandantes en este caso no tenían mayor acceso a los medios ni habían asumido cargos influyentes en la discusión pública. Véase Kassel v. Gannett Co., Inc., supra, 939-940.

Aunque pudiera argumentarse que los puestos del señor Gómez Márquez y la señora Morrabal Cintrón son de alta jerarquía dentro de una de las oficinas regionales del Departamento de Educación, no tienen el potencial de impactar la política pública que tenían los otros cargos en que hemos determinado que un empleado es un funcionario público debido a su jerarquía en el escalafón gubernamental. Véase Meléndez Vega v. El Vocero de PR, supra (Directora del

Centro Metropolitano de Investigaciones y Denuncias del Departamento de Justicia) y Zequeira Blanco v. El Mundo, Inc., supra (Juez de Distrito). El cargo del señor Gómez Márquez era más bien de asistente administrativo y apoyo técnico en asuntos de contabilidad y el de la señora Morrabal Cintrón, aunque con mayor jerarquía, se limitaba a asuntos académicos y administrativos para aplicar una política pública sobre la que ella no tenía control. Tampoco están presentes las consideraciones de política pública que nos movieron a adoptar la norma de considerar a los agentes del orden público como funcionarios públicos. A diferencia de un policía, los empleados en este caso no tienen control sobre los derechos de los ciudadanos a su vida y libertad. Véase Soc. de Gananciales v. López, supra (policía raso); véase, también, Soc. de Gananciales Rodríguez v. El Vocero de P.R., supra (Director del Cuerpo de Investigaciones Criminales de la Policía, Región de Ponce).

IV

Debido a que los peticionarios son personas privadas, solo es necesario que se demuestre negligencia para poder imponer responsabilidad al periódico. La postura de El Regional es, esencialmente, que todo lo publicado es verdad y está fundado en la investigación que el periódico realizó. Enfatiza que los reportajes identificaron en varias instancias al señor Santos Cintrón como el único protagonista; que al señor Gómez Márquez y a la señora Morrabal Cintrón se les mencionó solo en su calidad de

responsables por el nombramiento o supervisión del señor Santos Cintrón, pero que no se dijo que estos hayan sido parte del fraude, y que, cuando se habló de la "cacería de brujas" en el Departamento de Educación, del señor Gómez Márquez y la señora Morrabal Cintrón solo se dijo que eran funcionarios en las oficinas desde las que se inició dicha cacería, no que fueron ellos quienes la iniciaron.

Es cierto lo que sostiene El Regional, pero ignora detalles cruciales que proveen contexto a lo que se publicó. El primero y más evidente es que en uno de los reportajes se les llamó "principales arquitectos [del] fraude". Aunque esta es la única frase propiamente difamatoria, basta con ella para imponer responsabilidad por negligencia. La intención del periodista de relacionar a estos empleados con el fraude quedó reforzada con sus otros comentarios. Aunque los reportajes identificaron al señor Santos Cintrón como el protagonista, y se concentraron en él, también insistieron en que este debió actuar en conjunto con otras personas. Eso, unido al hecho de que los nombres de la señora Morrabal Cintrón y del señor Gómez Márquez son de los pocos otros que se mencionan en los artículos, lleva a sospechar si las manos de la señora Morrabal Cintrón y del señor Gómez Márquez estaban limpias o no. Por otro lado, aunque muchas de las cosas que se mencionaron de los implicados son verdaderas y verificables -que trabajan en cierta oficina, que tienen ciertas funciones-, es llamativo que el autor escogió mencionar esos datos específicos y no tantos otros que

también son verdaderos sobre muchos otros empleados que laboran en esas oficinas. Si el autor no quiso atar a la señora Morrabal Cintrón y al señor Gómez Márquez al fraude, el dato de que trabajan en tal oficina o tienen tal función sería totalmente irrelevante.

Al final de la serie, el autor comentó que de la investigación de El Regional se desprendía que el señor Santos Cintrón no actuó solo, pero que la serie debía culminar para darle espacio a las autoridades a que concluyeran su investigación. Mencionó también que la Fiscalía y la Policía no le habían dado la atención meritoria al caso. Aunque el autor no tenía suficiente evidencia para relacionar a la señora Morrabal Cintrón o al señor Gómez Márquez con el fraude, intentó con sus reportajes arrojar dudas sobre estos, al mencionarlos junto a la declaración de que la investigación debía continuar porque el señor Santos Cintrón no actuó solo. No hay nada que respalde esa aseveración.

La negligencia es la falta del debido cuidado, que consiste en no prever las consecuencias racionales de un acto u omisión, que una persona prudente habría de prever en las mismas circunstancias. Colón, Ramírez v. Televicentro de P.R., 175 DPR 690, 706-707 (2009). Los criterios que debe utilizar un tribunal para determinar si el demandado en una acción por difamación incurrió en negligencia son: (1) la naturaleza de la información publicada y la importancia del asunto sobre el cual trata, especialmente si la información

es libelosa de su faz y puede preverse el riesgo de daño; (2) el origen de la información y la confiabilidad de su fuente, y (3) la razonabilidad del cotejo de la veracidad de la información, lo cual se determina tomando en consideración el costo en términos de dinero, tiempo, personal, la urgencia de la publicación, el carácter de la noticia y cualquier otro factor pertinente. Íd., pág. 707.

Entendemos que se probó la negligencia. La información que el periódico publicó es libelosa de su faz. Decir de tres personas que son los "principales arquitectos [del] fraude" deja poco margen de duda en cuanto a que se les quiso hacer parte del esquema de fraude. Esa expresión tiene un riesgo claro de daño que pudo haberse previsto fácilmente. Si consideramos, además, que el periódico ya tenía suficiente información del señor Santos Cintrón y su participación en el fraude, era totalmente innecesario, para efectos de poder informar al público sobre el fraude, incluir los nombres de los demandantes en este caso. Se incluyeron para vincularlos con el fraude, sin evidencia de ello.

Además, como señalamos en nuestra Sentencia de 23 de diciembre de 2011 en este caso:

> Los documentos que presentó el semanario con su solicitud de sentencia sumaria no sostienen las afirmaciones de que los peticionarios fueran partícipes o arquitectos del esquema de fraude. Por el contrario, […] demuestra[n] que el único partícipe y arquitecto del fraude fue el señor Santos Cintrón. Ante esa realidad, la defensa del periódico es insistir que no se escribió lo que está publicado.
>
> […]

Las denuncias contra el señor Santos Cintrón, las cartas del Director Regional del CIC, de Ricardo Rovira Blondet, y la respuesta del señor Santos Cintrón, tampoco aportan nada para sostener la posición del periódico. Gómez Márquez y otros v. El Regional de Guayama, CC-2008-0047, págs. 20-21.

V

Atendidos los primeros dos errores planteados por el señor Gómez Márquez y la señora Morrabal Cintrón, pasamos a resolver los otros dos: que la parte demandada no obró con temeridad y que el presidente del periódico no era responsable civilmente. En cuanto al tema de la temeridad, coincidimos con el Tribunal de Apelaciones. Hemos dicho que "si en la discreción del tribunal de instancia se determina que hubo temeridad […] es mandatorio imponer honorarios", pero que "se intervendrá con dicha determinación si media un claro abuso de esa discreción". Meléndez Vega v. El Vocero de PR, supra, pág. 211 (citas omitidas). Sin embargo, la temeridad "es improcedente en aquellos litigios que encierran planteamientos complejos y novedosos aun no resueltos en nuestra jurisdicción, así como cuando la parte concernida responde a lo que resulta ser una apreciación errónea del derecho". Íd., pág. 212 (citas omitidas). "El propósito de los honorarios de abogado es sancionar al litigante perdidoso que[,] por su temeridad, obstinación, contumacia e insistencia en una actitud frívola o desprovista de fundamento, obliga a la otra parte a asumir innecesariamente las molestias, los gastos, el trabajo y las inconveniencias de un pleito". Méndez v. Morales, supra,

pág. 40. No se actúa con temeridad cuando se poseen argumentos para rebatir lo que sostiene la parte contraria. Véase íd. En este caso, ambas partes tenían argumentos plausibles para sostener sus posturas. Como bien señaló el Tribunal de Apelaciones, el hecho de que el periódico prevaleció en varias de las instancias, abona a esta conclusión.

En cuanto a la responsabilidad del presidente y editor de El Regional, entendemos que sí se cometió el error. Véase Meléndez Vega v. El Vocero de PR, supra, donde impusimos responsabilidad a la empresa mediática y a sus funcionarios principales. Los editores de una publicación tienen la responsabilidad de velar por el trabajo que se publicará, lo que incluye prestar atención a expresiones potencialmente difamatorias. Véase Sanford, supra, Sec. 3.3.3 (Supl. 1993). En este caso, una lectura simple de los reportajes debió levantar gran sospecha de que lo dicho sobre el señor Gómez Márquez y la señora Morrabal Cintrón no estaba corroborado con evidencia, pues los artículos se limitaron a llamarles "arquitectos" del fraude, sin explicar por qué.

VI

Resolvemos que el señor Gómez Márquez y la señora Morrabal Cintrón son personas privadas, que fueron difamadas por los reportajes de El Regional y que cumplieron con el estándar requerido de negligencia. Los demandados son responsables solidariamente por los daños sufridos por el señor Gómez Márquez y la señora Morrabal Cintrón, por las

cuantías que impuso el Tribunal de Primera Instancia. No procede la imposición de honorarios de abogado por temeridad. La sentencia del Tribunal de Apelaciones queda revocada en todo lo incompatible con esta Opinión.

Se dictará sentencia de conformidad.

RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| David Gómez Márquez; Juanita Morrabal Cintrón y Gilberto Burgos López<br><br>Peticionarios<br><br>v.<br><br>Periódico El Oriental Inc. h/n/c El Regional de Guayama; Sucesión de Vicente Pierantoni, Presidente y Editor, compuesta por Vicente Pierantoni González; Miguel A. Pierantoni González; Magda Pierantoni González; Juan R. Pierantoni González; Alberto Cruz, Administrador; Aseguradora ABC<br><br>Recurridos | CC-2018-0967 | |

SENTENCIA

En San Juan, Puerto Rico, a 14 de enero de 2020.

Por los fundamentos antes expuestos en la Opinión que antecede, la cual se hace formar parte de esta Sentencia, resolvemos que el señor Gómez Márquez y la señora Morrabal Cintrón son personas privadas, que fueron difamadas por los reportajes de El Regional y que cumplieron con el estándar requerido de negligencia. Los demandados son responsables solidariamente por los daños sufridos por el señor Gómez Márquez y la señora Morrabal Cintrón, por las cuantías que impuso el Tribunal de Primera Instancia. No procede la imposición de honorarios de abogado por temeridad. La sentencia del Tribunal de Apelaciones queda revocada en todo lo incompatible con esta Opinión.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Colón Pérez disintió e hizo constar lo siguiente: "El Juez Asociado señor Colón Pérez disiente de lo resuelto por una mayoría de este Tribunal en el presente caso pues, -- si bien considera que los peticionarios en la causa de epígrafe deben ser considerados como personas privadas --, a su juicio, no se cumplió aquí con el estándar de prueba necesario para poder instar una causa de acción por difamación en contra del

Periódico El Oriental, Inc. h/n/c El Regional de Guayama, *et als*."

La Juez Asociada señora Rodríguez Rodríguez y el Juez Asociado señor Estrella Martínez disintieron sin opinión escrita. La Jueza Presidenta Oronoz Rodríguez no interviene. El Juez Asociado señor Feliberti Cintrón está inhibido.

José Ignacio Campos Pérez
Secretario del Tribunal Supremo